**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Craig CHAPMAN and Jack E. Wright, Defendants–Appellants.**

**Nos. 89–2483, 89–2692 and 89–2782.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1991.[*]

Decided Jan. 27, 1992.

---

* Appeal Nos. 89–2483 and 89–2782 were submitted for decision without argument.

Andrew B. Baker, Jr., Asst. U.S. Atty., Dyer, Ind., for U.S.

Craig Chapman, pro se.

Anthony J. Valentine, Grand Rapids, Mich., for Jack E. Wright.

Fred R. Hains, South Bend, Ind., for Craig Chapman.

Before CUDAHY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Following jury trials, Craig Chapman and Jack E. Wright each were convicted of violating 18 U.S.C. § 371 (conspiracy to commit armed bank robbery), 18 U.S.C. § 2113(a), (d) (armed bank robbery), and 18 U.S.C. § 924(c)(1) (use of a firearm during and in relation to a crime of violence). In this pre-Sentencing Guidelines case, each defendant was sentenced on the three counts to consecutive prison terms of five, fifteen, and five years. These twenty-five year sentences were to be concurrent to the defendants' related state sentences. In this consolidated appeal, Mr. Chapman challenges his judgment of conviction as well as his sentence, and Mr. Wright challenges his judgment of conviction. For the reasons set forth in this opinion, we affirm the judgments of the district court in all respects.

I

BACKGROUND

A. *Facts*

In 1987, Mr. Chapman and Mr. Wright were airmen in the 305th Security Police Squadron at Grissom Air Force Base in Indiana. Their case involves the armed robbery of two federally insured banks. The first robbery occurred on May 29, 1987, when an armed man entered the Wabash Valley Bank and Trust Company in Denver, Indiana (Denver bank). The robber soon left with $14,620, including bait money. Although his face was partly hidden and he could not be identified, witnesses were able to recognize that he was black. Shortly before the robbery, witnesses had observed an automobile, driven by a white man with a black passenger, near the Denver bank. The description of that automobile matched that of one belonging to Mr. Chapman's mother. Mr. Chapman is black, and Mr. Wright is white.

Several days later, Thomas Pezet, a third member of the 305th Security Police, approached Mr. Chapman about the Denver bank robbery. Pezet had seen Chapman driving a car that matched the description of the getaway vehicle and had heard Mr. Chapman joke about robbing a bank. After Mr. Chapman admitted that he and another individual had robbed the Denver bank, Pezet confronted Mr. Wright about the robbery. Mr. Wright threatened to kill Pezet and his family if Pezet told anyone. With this threat in the background, Pezet later was induced to drive his own new pick-up truck as the getaway car for a second robbery.

That robbery occurred on July 3, 1987, at the First National Bank of Logansport in Twelve Mile, Indiana (Twelve Mile bank). Accompanied by Mr. Wright and Mr. Chapman, Pezet parked his gray Ford Ranger pick-up truck behind a fire station that is separated by an alley from the Twelve Mile bank. Mr. Wright and Mr. Chapman, both armed, robbed the bank of $7,246; once again, their booty included marked bait money. The pair fled to the waiting Ford Ranger and got into the back of the truck, which was covered by a cap. Pezet then drove out of town.

A short time later, Indiana State Police officers who had received a description of the getaway vehicle pulled over Pezet's truck heading south on U.S. Route 31. Officers discovered Mr. Wright and Mr. Chapman in the back of the truck; they were removed and arrested. The appellants were wearing clothes that matched the description of the Twelve Mile bank robbers. They had with them a bag containing $7,246, including the marked Twelve Mile bait money. Three bills with serial numbers matching the Denver bait money were

later found at Mr. Wright's quarters.[1]

On October 13, 1988, a federal grand jury handed down a five-count superseding indictment against Mr. Chapman and Mr. Wright. Count One charged both men with conspiracy to commit armed bank robbery, in violation of 18 U.S.C. § 371. Count Two charged Mr. Wright with aiding and abetting the armed robbery of the Denver bank, in violation of 18 U.S.C. §§ 2, 2113(a), (d). Count Three charged Mr. Wright with aiding and abetting the use of a dangerous weapon during and in relation to a crime of violence (the Denver bank robbery), in violation of 18 U.S.C. §§ 2, 924(c)(1). The final two substantive counts charged Mr. Chapman with identical violations in relation to the Twelve Mile bank robbery.[2]

## II

## ANALYSIS

### A. *Mr. Chapman's Appeal*

1. Search and seizure

Prior to trial, Mr. Chapman filed a motion to suppress evidence, in which he challenged the search that was conducted at the time of his arrest following the Twelve Mile bank robbery.[3] Indiana State Trooper David Fouts and Sergeant Carlos Pettiford stopped Pezet's Ford Ranger after they learned that the Twelve Mile bank had just been robbed and that a vehicle matching the description of Pezet's vehicle was the getaway car. The officers also had been notified that three men were involved and that two of them might be hiding in the rear of the truck. In addition, they had been alerted that a black revolver had been displayed during the robbery. When Trooper Fouts first attempted to stop Pez-

et, he refused to stop until forced to the side of the road by Sergeant Pettiford. The officers then confirmed that two men were hiding in the back of the truck. As Mr. Chapman and Mr. Wright were escorted out of the truck, Trooper Fouts observed in the back of the truck, in plain view, "what appeared to be the top of a money bag, a holster, and a dark ski mask." Magistrate's Report and Recommendation of Feb. 1, 1989 (R.12) at 5.[4] Both men, as well as Pezet, then were handcuffed and advised of their rights. After the airmen had been handcuffed, Sergeant Pettiford found two handguns underneath the carpet at the front of the truck bed. He also opened the "money bag" or duffel bag and found that it contained money.

The magistrate concluded that the officers' reasonable suspicion ripened into probable cause to arrest Mr. Chapman and his colleagues because they attempted to evade capture, because two men were in the rear of the truck as reports had indicated, and because the duffel bag, ski mask, and holster were observed in plain view. Relying primarily on *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the magistrate further concluded that the search of the rear of the truck and of the duffel bag was a permissible search incident to the lawful arrest of Mr. Chapman. According to the magistrate, the search also was justified under *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), because the officers had probable cause to believe that the fruits and instrumentalities of the crime were to be found in the truck. The magistrate therefore recommended denial of Mr. Chapman's motion to suppress, and the district court denied his objections to

---

**1.** We shall present additional facts relevant to specific issues later in this opinion.

**2.** Mr. Chapman already had been convicted of state offenses for his involvement in the Denver bank robbery, and Mr. Wright had been convicted of state offenses related to the Twelve Mile bank robbery.

**3.** Because Mr. Chapman now concedes that officers "were within the parameters of the fourth

amendment at the inception of the stop" of the Ford Ranger, Appellant Chapman's Supplemental Br. at 27, we focus only on those facts and issues related to the search subsequent to the initial stop.

**4.** Although Mr. Chapman claimed at the suppression hearing that the items were not in plain view, the magistrate expressly declined to credit that assertion. *See* R.12 at 7.

the magistrate's recommendations on March 1, 1989.

In this appeal, Mr. Chapman repeats his contention that items seized at the time of his arrest on the highway following the Twelve Mile bank robbery should have been suppressed. Although he concedes that police had reasonable suspicion to stop the truck in which he was hiding, he contends that he was arrested without probable cause and that the search thus was not incident to a valid arrest. We thus must determine if his arrest was based on probable cause; furthermore, we must determine if the scope of the warrantless search was justified.

### a. probable cause to arrest

■ When probable cause exists to believe that an individual has committed a felony, police may arrest the individual outside his home without an arrest warrant. *See United States v. Watson*, 423 U.S. 411, 423–24, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). "Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). As the Court noted in *Brinegar*, when courts attempt after the fact to distinguish between "mere suspicion and probable cause," the "line must necessarily be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances." *Id.* 338 U.S. at 176, 69 S.Ct. at 1311. We review de novo the district court's legal determination that probable cause existed for the warrantless arrest, and apply the clearly erroneous standard to the district court's factual findings. *See, e.g., United States v. Yakubu*, 936 F.2d

936, 938 (7th Cir.1991) (per curiam); *United States v. Sophie*, 900 F.2d 1064, 1072 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990); *United States v. Ingrao*, 897 F.2d 860, 862 (7th Cir.1990).[5]

■ Based on our independent review of the record, we agree with the conclusion of the magistrate, which was adopted by the district court, that the Indiana officers had probable cause to arrest Mr. Chapman. The officers knew that a bank robbery had just occurred and that the description of the getaway vehicle closely matched that of Pezet's new Ford Ranger. Pezet's initial refusal to stop his truck when the officers signalled him to pull over "reinforced the reasonableness of the officers' belief that [the driver] had committed or was committing a crime." *United States v. McCarty*, 862 F.2d 143, 147 (7th Cir. 1988). Sergeant Pettiford's suspicion momentarily might have been allayed when he recognized Pezet, whom he knew to be an airman at Grissom. Nonetheless, his suspicion and that of Trooper Fouts rose to the level of probable cause when they discovered two men hiding in the rear of the truck, just as their reports had indicated. Moreover, the observation of a holster and a ski mask—in July—would certainly justify experienced officers in concluding that Mr. Chapman and his cohorts were involved in the reported bank robbery. Under the totality of the circumstances standard, Mr. Chapman's warrantless arrest was supported by probable cause.

### b. warrantless search

■ It is uncontrovertible that, once they legally had arrested Mr. Chapman, the Indiana officers were justified in conducting the warrantless search that uncovered the weapons and the money in the duffel bag. In *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Court held that

> when a policeman has made a lawful custodial arrest of the occupant of an

---

5. Because no transcript of the evidentiary hearing on Mr. Chapman's suppression motion is included in the record on appeal, we base our review on the testimony of Trooper Fouts and Sergeant Pettiford at Mr. Chapman's trial.

automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment....

*Id.* at 460, 101 S.Ct. at 2864 (footnotes omitted).[6] Such containers include "luggage, boxes, bags, clothing, and the like," *id.* at 461 n. 4, 101 S.Ct. at 2864 n. 4, and thus the duffel bag in this case was properly within the scope of the search. Although we find no error in the alternative rationale for the search relied on by the magistrate and district court—that officers had probable cause to believe that the fruits and instrumentalities of the robbery were to be found in the truck[7]—the Court in *Belton* made clear that " '[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.' " *Id.* at 461, 101 S.Ct. at 2864 (quoting *United States v.*

*Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973)).[8]

**2. Severance and double jeopardy**

Prior to trial, Mr. Chapman filed a motion for severance.[9] Mr. Wright admitted in state court that he had been present during the Twelve Mile bank robbery, but claimed to have been too intoxicated to form the specific intent to rob the bank. In his motion to sever, Mr. Chapman argued that Mr. Wright's anticipated intoxication defense in the upcoming federal trial would be antagonistic to his own defense of nonparticipation. The magistrate concluded that the two anticipated defenses were not mutually antagonistic and thus recommended denial of Mr. Chapman's motion to sever. Mr. Chapman's objection to this recommendation also was denied by the district court on March 1, 1989.[10] A week later, the court denied Mr. Chapman's motion to have his case tried before the judge rather than a jury.

A joint jury trial began on June 19, 1989, and the court denied Mr. Chapman's renewed motion to sever. Mr. Wright testi-

---

**6.** Although the compartment in which Mr. Chapman was hiding might not be a conventional passenger compartment, he can take no solace from the fact that the *Belton* Court noted that its holding did not extend to the trunk of an automobile. 453 U.S. at 461 n. 4, 101 S.Ct. at 2864 n. 4. Under the circumstances of this case, it is abundantly clear that the rear of the truck functioned as a passenger compartment at the time of the arrest.

**7.** *See United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

**8.** In his supplemental pro se brief, Mr. Chapman also contends that his right to a speedy trial was violated because of the approximately 15–month delay between the second bank robbery and his federal indictment. However, the Supreme Court has made clear that the speedy trial protections of the Sixth Amendment are triggered only by a federal arrest or indictment. *See United States v. Marion,* 404 U.S. 307, 320–21, 92 S.Ct. 455, 463–64, 30 L.Ed.2d 468 (1971); *accord United States v. Zukowski,* 851 F.2d 174, 178 (7th Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 174, 102 L.Ed.2d 144 (1988). Mr. Chapman also makes a passing reference to his Fifth Amendment due process right, which does apply to pre-indictment delay. However, he has failed to carry his burden to "demonstrate actual and substantial prejudice from the delay." *Zukowski,* 851 F.2d at 178.

The only possible allegation of prejudice in his brief is the fact that, "[o]n June 16, 1989 Chapman was informed that two key witnesses to the Denver robbery were unable to be served or located." Appellant Chapman's Supplemental Br. at 11. We are given absolutely no indication what these "two key witnesses" might have contributed to Mr. Chapman's defense. Even in light of the liberal construction that we apply to the briefs of pro se appellants, this cursory treatment provides no basis for us to consider any further Mr. Chapman's due process contention.

**9.** Mr. Wright also moved to sever the trials, but his motion is not directly relevant to this appeal.

**10.** The district court also denied Mr. Chapman's motion to dismiss Counts Four and Five. Mr. Chapman claimed that his double jeopardy rights would be violated if he were tried both for armed robbery under § 2113 and for use of a firearm during and in relation to a crime of violence under § 924(c)(1).

Mr. Chapman also brought a motion to dismiss based on alleged violations of his rights to due process and a speedy trial because of the 15–month delay between his arrest and federal indictment. The magistrate recommended denial of that motion and the district court later denied the motion.

fied in his own defense. He presented an alibi defense in regard to the Denver bank robbery, claiming to have been at his parents' home in Indianapolis at the time. He also testified that the Denver bank bait money found in his quarters was money that he had borrowed from Mr. Chapman. Mr. Wright claimed that Mr. Chapman and Pezet had admitted committing the Denver robbery. (Pezet, however, had been on duty in Columbus, Ohio, on the day of that incident. Mr. Wright also repeated his intoxication defense regarding the Twelve Mile robbery; in addition, he claimed that his participation had been induced by Mr. Chapman's threats.)

Mr. Chapman, who was conducting his own defense, sought to cross-examine Mr. Wright to bring out evidence that, during state plea negotiations, he had admitted participation in the Denver robbery. However, because Mr. Wright's plea had been withdrawn, the district court earlier had ruled that he could not be examined about the plea negotiations.[11] In response to the government's opposition to severance, Mr. Chapman observed, "obviously as I moved for severance pretrial [and] throughout the course of the trial before we got to this point, the court was alerted that this would be a problem somewhere in the course of the trial." Tr. of June 27, 1989 at 806. The court concluded that Mr. Chapman's inability to cross-examine Mr. Wright on his prior inconsistent statement threatened to "run[ ] afoul of the confrontation clause." *Id.* at 810. The court therefore severed Mr. Chapman out of the trial and ordered Mr. Wright's trial to continue. Mr. Chapman raised no objection at the time to the court's decision to allow Mr. Wright's trial, rather than his own, to continue. Mr. Wright's trial concluded with his conviction on all three counts.

On July 10, 1989, the day his second trial was scheduled to begin, Mr. Chapman filed a motion to dismiss in which he claimed that the second trial would violate his double jeopardy rights. The district court not-

ed that "at the time the severance occurred it was my understanding that you agreed once we got to that point if the trial was going to go forward it had to be Wright's rather than yours with Wright having testified and having dumped it pretty heavily on you during his testimony." Tr. of July 10, 1989 at 251. Mr. Chapman responded as follows:

> [I]f I understood that bowing out of the trial at that point would have caused me to go through a separate jury trial without that first jury and without the possibility of impeaching Mr. Wright on what he said in that trial, I probably would have elected to stay in that trial even though Mr. Wright's testimony weighed heavily against me.

*Id.* After the government pointed out that Mr. Chapman himself had sought severance in the first trial and the court observed that the various severance motions had not been based on the Rule 410 issue that eventually forced the severance, the court denied the motion to dismiss.[12] At the end of Mr. Chapman's separate jury trial, he was convicted on all three counts.

Mr. Chapman now makes two related arguments in this appeal: (1) that the district court erred in refusing his pretrial severance motions and (2) that his mid-trial severance and consequent retrial violated his double jeopardy rights. We address each of these related issues in turn.

#### a. denial of pretrial severance motions

 Under Federal Rule of Criminal Procedure 14, courts are authorized to grant a severance of defendants if a joint trial would be prejudicial. However, a joint trial of co-conspirators is "presumptively appropriate," and we review a district court's refusal of a severance motion under an abuse of discretion standard. *United States v. Bond*, 847 F.2d 1233, 1240 (7th Cir.1988). Severance is mandatory only if the anticipated defenses of two co-defendants are " 'mutually antagonistic' "—that

---

**11.** *See* Fed.R.Evid. 410.

**12.** The court also refused to stay the trial pending Mr. Chapman's interlocutory appeal on the double jeopardy issue. That appeal, No. 89–2483, later was ordered consolidated with the two post-trial appeals in this case.

is, only if "the acceptance of one party's defense will preclude the acquittal of the other." *United States v. Ziperstein*, 601 F.2d 281, 285 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).[13] In a memorandum in support of his motion to sever, Mr. Chapman contended only that Mr. Wright was likely to admit participation in the Twelve Mile bank robbery and to rely on the intoxication defense that he had offered in state court. However, a jury could have believed that Mr. Wright lacked the specific intent to engage in bank robbery without necessarily concluding that Mr. Chapman was guilty of the same robbery.[14] Therefore, the district court did not abuse its discretion in denying Mr. Chapman's pretrial severance motions.

### b. mid-trial severance and retrial

■ We also conclude that the district court did not violate Mr. Chapman's double jeopardy rights by severing his case in the middle of the joint trial and ordering his retrial. The district court finally granted Mr. Chapman's oft-repeated request for severance only after it concluded that Federal Rule of Evidence 410 prevented him from impeaching Mr. Wright with the latter's admission, during negotiations over his withdrawn state plea, that he had participated in the Denver bank robbery. Because Mr. Wright's trial testimony implicated Mr. Chapman in that robbery, the district court found that severance was required to protect Mr. Chapman's confrontation clause rights. Mr. Chapman made no objection to severance at this time; indeed, the severance was granted upon renewal of his earlier motions. The district court both carefully considered the tension between the rights of the co-defendants and, by delaying his decision for a day, gave Mr.

Chapman adequate opportunity to decide if he still desired a severance and mistrial.

As this court made clear in *United States v. Buljubasic*, 808 F.2d 1260 (7th Cir.), *cert. denied*, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987), a defendant's double jeopardy rights are not violated when a trial court grants a defendant's own mistrial motion.

> The court finally gave him the relief he sought so avidly, and the double jeopardy clause does not prevent retrial. Only when "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial" does the "manifest necessity" standard come into play.

*Id.* at 1265 (quoting *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982)). Although Mr. Chapman later implied that he would not have sought a mistrial if he had understood that he faced retrial, *see supra* p. 1359 (citing Tr. of July 10, 1989), our review of the events leading to the severance convinces us that the district court "was entitled to treat this as a consensual mistrial." *Buljubasic*, 808 F.2d at 1265. We also find no error in the district court's decision to sever Mr. Chapman's case rather than that of Mr. Wright. First, as we have noted, it was Mr. Chapman who sought such relief at the time it was granted. Furthermore, Mr. Wright already had presented his case when Mr. Chapman's confrontation clause problem arose. Finally, as the district court noted:

> Had the court declared a mistrial with respect to Mr. Wright rather than Mr. Chapman, there is no suggestion Mr. Wright willingly would have remained on the stand for cross-examination. Had Rule 410 not precluded Mr. Chapman's intended cross-examination of Mr.

---

13. *See also United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.) ("Unless the defenses are so inconsistent that the *making* of a defense by one party will lead to an unjustifiable inference of another's guilt, or unless the acceptance of a defense *precludes* acquittal of other defendants, it is not necessary to hold separate trials.") (emphasis in original), *cert. denied*, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987).

14. Just before the jury was impaneled in the joint trial, the district court was informed that Mr. Wright might testify that Mr. Chapman had given him the bait money from the Denver robbery that had been found in Mr. Wright's quarters. However, even this possible testimony did not *mandate* granting Mr. Chapman's severance motion before the trial began. *See Buljubasic*, 808 F.2d at 1263 ("Finger-pointing is an acceptable cost of the joint trial....").

Wright, the fifth amendment privilege against self-incrimination likely would have done so. Mr. Chapman does not suggest that he would have been content with the striking of Mr. Wright's testimony and an admonition to the jury to disregard it.

Mem. op. of July 11, 1989 at 12.

3. Denial of compulsory process

Mr. Chapman also contends that the district court denied his Sixth Amendment right to compulsory process when it denied in part his petition for issuance of thirty-seven subpoenas pursuant to Federal Rule of Criminal Procedure 17(b). The facts essential to resolve this challenge are as follows.

■ On May 30, 1989, Mr. Chapman petitioned the court to issue, pursuant to Federal Rule of Criminal Procedure 17(b), subpoenas for thirty-seven witnesses necessary to his defense. On June 6, the district court held an ex parte hearing to determine which of the thirty-seven proposed witnesses were necessary to an adequate defense of Mr. Chapman. After a complete hearing, the court took the matter under advisement. On June 9, the court issued a sixteen-page ex parte memorandum and order analyzing Mr. Chapman's need for each witness, and concluded by granting the petition with respect to fourteen witnesses and denying the petition with respect to twenty-three witnesses. R.26. Recognizing that Mr. Chapman's pro se status may

have led him to state the bases of his requests less articulately than counsel would have done, the court declared that close issues would be resolved in favor of Mr. Chapman. With regard to twenty of the denied witnesses, the court reasoned that their testimony would most likely be irrelevant, inadmissible, or not probative. With regard to the remaining three denied witnesses, the court reasoned that their testimony would only be relevant as cross-examination testimony, if indeed they testified for the prosecution.

The fourteen subpoenas were issued, and the witnesses were available in the courthouse, ready to testify, when the prosecution closed its case on July 14, 1989. After this considerable expenditure of judicial resources, including the costs of service and witness fees, which were waived under Federal Rule of Criminal Procedure 17(b), Mr. Chapman chose to rest his case without examining any of the subpoenaed witnesses.[15]

On appeal, Mr. Chapman contends that the district court denied him "key witnesses to his defense" such that he "could not adequately present his defense to the charges in the indictment." Appellant Chapman's Supplemental Br. at 25. Mr. Chapman does not give reasons to support his contention that, contrary to the reasoning of the district court, the witnesses he was denied were necessary to an adequate defense.

---

**15.** The transcript of the proceeding, at the point when Mr. Chapman was to begin his case with an opening statement, which he had reserved, reads:

> THE COURT: .... Mr. Chapman, you may proceed.
>
> DEFENDANT CHAPMAN: Good morning, ladies and gentlemen of the jury, Honorable Judge Miller, the rest of the people in court today—you can't hear me?
>
> THE COURT: Is the microphone on?
>
> DEFENDANT CHAPMAN: Originally I had intended to present thirty-seven witnesses in my behalf. Due to matters of law that have already—
>
> [PROSECUTION]: Objection. This is irrelevant, Judge, in terms of subpoenas having been issued.

> THE COURT: Mr. Chapman, you need to limit yourself to what the evidence will show and not the procedural discussions.
>
> DEFENDANT CHAPMAN: I have mulled this over a sufficient amount of time. I won't be able to present the evidence that I had intended to present. I have been limited. Therefore, I feel that it would be a waste of time to call anyone in here to say that I did or did not commit this robbery or robberies. Therefore, with the court's indulgence, I would make this my opening and my closing.
>
> THE COURT: Is it your desire to rest without presenting evidence? You have a right to do that if that is what you want to do.
>
> DEFENDANT CHAPMAN: Yes, your Honor.
>
> THE COURT: If that is the case there are a couple of matters that need to be taken care of....

Tr. of July 14, 1989 at 951–52.

Federal Rule of Criminal Procedure 17(b) requires a court to subpoena witnesses for indigent defendants when "the presence of the witnesses is necessary to an adequate defense." This court has held that a trial judge has "wide discretion" in determining whether to issue a given subpoena under rule 17(b). *United States v. Garza*, 664 F.2d 135, 141 (7th Cir.1981) (and cases cited therein), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982). We are persuaded by the district court's reasons for concluding that twenty-three of the thirty-seven proposed witnesses were not necessary for Mr. Chapman to present an adequate defense, and in the absence of any persuasive counterargument by Mr. Chapman on appeal, we conclude that the district court did not abuse its discretion in denying Mr. Chapman twenty-three of the thirty-seven subpoenas he requested. The district court adequately respected Mr. Chapman's Sixth Amendment right to compulsory process when it granted him subpoenas for fourteen witnesses.

### 4. Effective assistance of counsel

Although the district court repeatedly warned Mr. Chapman of the perils of proceeding pro se, Mr. Chapman insisted on representing himself at trial. The court appointed standby counsel to assist Mr. Chapman, although the record reflects that Mr. Chapman repeatedly refused to cooperate with standby counsel. On appeal, Mr. Chapman accompanies his compulsory process challenge with a claim that he had ineffective assistance of counsel.

The first argument Mr. Chapman offers in support of this claim is that correctional officials at the Metropolitan Correctional Center in Chicago (MCC), where Mr. Chapman was incarcerated before trial, denied him sufficient access to the MCC's law library. This court has consistently held that " 'when a defendant (pretrial detainee) is offered the assistance of appointed counsel and refuses the same, no constitutional right exists mandating that the prisoner in the alternative be provided access to a law library should he refuse the services of court-appointed counsel.' " *United States v. Moya–Gomez*, 860 F.2d 706, 743 (7th Cir.1988) (quoting *United States ex rel. George v. Lane*, 718 F.2d 226, 227 (7th Cir.1983)), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989).[16]

The next argument Mr. Chapman offers in support of this claim is that the assistance of standby counsel "fell well below normal standards of representation." The record, however, does not reflect any shortcomings in the efforts of standby counsel, or that any actions of standby counsel prejudiced Mr. Chapman's defense in any way. The record does show that Mr. Chapman refused to cooperate with standby counsel and that the district court cautioned Mr. Chapman that he was squandering a valuable resource.[17]

16. *See also Martin v. Davies*, 917 F.2d 336, 340 (7th Cir.1990) ("Simply because a defendant has *refused counsel does not entitle him to limitless* access to law libraries."), *cert. denied*, —— U.S. ——, 111 S.Ct. 2805, 115 L.Ed.2d 978 (1991). Although neither party makes note of the matter, our examination of the docket sheet indicates that the district court entered an order requiring officials of the Metropolitan Correctional Center to afford the defendant adequate access to a law library. The record also contains a subsequent letter to the district court from the defendant in which he complained that the order was not being obeyed. R.25. The transcript reflects that the district court then notified Mr. Chapman that it would not proceed further on this matter until Mr. Chapman submitted a specific request for a specific order. Tr. of June 6, 1989 at 117. The record does not reflect that Mr. Chapman submitted such a request nor that the court took any further action. However, on this record, we must agree with the government's observation that the defendant's conduct of the proceedings reveals no prejudicial lack of access to a law library.

17. At a pre-trial hearing, the district court advised Mr. Chapman:

I would say, Mr. Chapman, [standby counsel] could do a better job for you as far as advising you as to different courses of action you might want to take, different motions you might want to make, different objections you might want to make, different witnesses you might want to call. He is there to help you with that. I have provided him to you for that, and from what I can tell he is more than willing to assist you in that.

By not sharing the discovery materials with him you are handcuffing him. That is your

Mr. Chapman also contends that standby counsel "totally betrayed appellants confidence with underhanded deception and trickery." While Mr. Chapman does not give examples to illustrate standby counsel's "trickery," the record reflects that Mr. Chapman complained to the court that when he asked standby counsel to provide him with a copy of Indiana Code § 17–3–14–5, standby counsel sent him Indiana Code § 35–33–1–1. Mr. Chapman suggested to the court that standby counsel was possibly "thinking for [him]" and hampering his defense. In fact, as standby counsel reminded the court, Indiana Code § 17–3–14–5 was recodified in 1980 at § 35–33–1–1. Tr. of April 26, 1989 at 86, 89.

■ As a rule, a defendant who chooses to represent himself cannot later claim ineffective assistance of counsel. *Faretta v. California*, 422 U.S. 806, 834–35 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975); *Prihoda v. McCaughtry*, 910 F.2d 1379, 1386 (7th Cir.1990); *United States v. Troxell*, 887 F.2d 830, 836 (7th Cir.1989) (and cases cited therein). Mr. Chapman has given this court no reason to create an exception to this rule.

### 5. Sentencing

■ Mr. Chapman's final contention is that the district court sentenced him illegally by an ex post facto application of the amended version of 18 U.S.C. § 924(c) (use of a firearm during and in relation to a crime of violence). In 1978, the Supreme Court held that Congress had not intended to authorize consecutive sentences under 18 U.S.C. §§ 924(c) and 2113(d) (armed bank robbery) because the latter section contains its own enhancement provision for use of a firearm. *See Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978). However, as Mr. Chapman concedes, Congress authorized such consecutive sentences when it amended section 924(c) in the Comprehensive Crime Control Act of 1984 (CCCA), Pub.L. No. 98–473, § 1005(a), 98 Stat.1976, 2138–39 (codified as further amended at 18 U.S.C. § 924(c) (1988)).[18] Mr. Chapman contends that the effective date of this amendment was November 1, 1987, months after the May and July events that underlie his convictions.

In fact, the November 1987 effective date relates only to the Sentencing Guidelines authorized by Chapter II of the CCCA.[19] Chapter X, which contained the relevant amendment of section 924(c), had no express effective date and thus became effective when enacted on October 12, 1984. *See United States v. Luskin*, 926 F.2d 372, 379–80 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 68, 116 L.Ed.2d 43 (1991); *United States v. Holloway*, 905 F.2d 893, 895 (5th Cir.1990) (per curiam); *United States v. Robinson*, 865

---

right and I don't mean to suggest that it is not your right and I'm not ruling that you have to, but I want you to take into account as you make your decision that you are making his job very difficult because if you ask him anything having to do with trial strategy or anything having to do with a motion or anything having to do with an objection, he is going to have a tougher time answering the question if he doesn't know what it is you are getting at if he doesn't know what your case is about.

So, as I say, I'm not ordering you to share those discovery materials with him or anything else, but I just want you to bear in mind that he has been provided as assistance to you. I'm not going to provide him as a research assistant or a volume of the Federal Reporter or a computer research terminal. That's not what he's there for. He is there to advise you at trial and advise you as to strategy, which he can do a lot better if you share your theories with him, and that is your call. Tr. of April 26, 1989 at 94–95.

**18.** *See United States v. Harris*, 832 F.2d 88, 90 (7th Cir.1987) (not discussing effective date but affirming conviction under amended § 924(c) for armed robbery occurring in 1986); *United States v. Jackson*, 835 F.2d 1195, 1198 n. * (7th Cir.1987) (similar), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988). The government points out in its brief that there is dicta in *United States v. Torres*, 809 F.2d 429, 431 n. 3 (7th Cir.1987), that indicates that the amended version of § 924 was to go into effect on November 1, 1986. That dicta is certainly not controlling in light of the latter cases.

**19.** Section 235(a)(1) of the CCCA, 98 Stat. 2031–32, provided a November 1, 1986 effective date for "this chapter." The effective date of the Sentencing Guidelines later was delayed to November 1, 1987. *See United States v. Robinson*, 865 F.2d 171, 172 n. 3 (8th Cir.1989) (per curiam) (citing Pub.L. No. 99–217, § 4, 99 Stat. 1728 (1985)).

F.2d 171, 172 (8th Cir.1989) (per curiam); *United States v. York*, 830 F.2d 885, 892 (8th Cir.1987) (per curiam), *cert. denied*, 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988); *see also United States v. Paiz*, 905 F.2d 1014, 1029–31 (7th Cir.1990) (distinguishing between delayed effective date of Sentencing Guidelines and immediate effective date of Chapter V of the CCCA), *cert. denied*, — U.S. —, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). We thus conclude that there was no ex post facto application of section 924(c) in this case.

### B. *Mr. Wright's Appeal*

#### 1. Search and seizure

Mr. Wright sought to suppress the fruits of the search of his quarters that had occurred shortly after his arrest. The district court determined that the acting base commander, who had authorized the search, had probable cause to do so. Memorandum and Order of Nov. 8, 1988 (R.28) at 4. Even though some of the information on which permission to search was granted related to the Denver bank robbery, which had occurred over one month prior to the July 6, 1987 search, the court concluded that the information "was not so stale as to defeat probable cause to believe the fruits and instrumentalities of the Denver robbery would be found in Airman Wright's quarters." *Id.* at 5.

The court next considered Mr. Wright's contention that the search was invalid because it had not complied with the Oath or Affirmation Clause of the Fourth Amendment[20] and with the analogous provision of Federal Rule of Criminal Procedure 41(c). Mr. Wright contended that the involvement of civilian federal and state authorities in the search had, in effect, converted the search from a military search to a "federal" one requiring strict compliance with the Fourth Amendment and with Rule 41(c). The district court agreed that there had been significant involvement of civilian authorities in developing the factual basis underlying the search. R.28 at 8–9. None-

theless, the court concluded that compliance with Military Rule of Evidence 315, which contains no oath or affirmation requirement, was adequate to protect Mr. Wright's Fourth Amendment rights. *Id.* at 9 (citing *United States v. Brown*, 784 F.2d 1033 (10th Cir.1986)). The court added that there was no evidence that "state and federal agents gained some improper tactical or strategic advantage by employing military procedures" in this case. *Id.* Furthermore, the court reasoned that the good faith exception to the exclusionary rule, *see United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), was applicable to the search of Mr. Wright's quarters. R.28 at 9–12.

Finally, the district court addressed Mr. Wright's claim that seizure of documents indicating his ownership of two pistols was outside the scope of the authorized search and not permissible under the "plain view" doctrine. The court granted Mr. Wright's suppression motion as to those documents, but otherwise denied the motions. *Id.* at 14.

Mr. Wright now appeals the district court's denial of his motion to suppress bait money obtained from the search of his quarters. Mr. Wright argues that (a) the state and federal law enforcement officials' active participation in the search transformed a military search into a federal or governmental search, which required full compliance with the Fourth Amendment, and (b) even if the search was purely military and only required compliance with military search procedures, it did not meet those procedures because Special Agent Reifert presented Lt. Col. Winge with insufficient evidence to find probable cause. The facts relevant to this challenge include the following.

The second robbery occurred on July 3, 1987, a Friday. The following Monday, July 6, Indiana State Police (ISP) Detective Kenneth Roland, the officer in charge of the ISP investigation of the first robbery, was notified of the second robbery. That morning, Air Force Office of Special Investigations (AFOSI) Special Agent Steven

---

**20.** The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particu- larly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Reifert called Detective Roland [21] to discuss the fact that three security police officers had been arrested three days earlier in connection with a bank robbery. Because Detective Roland believed the modus operandi was very similar in the two robberies,[22] he arranged to meet with Special Agent Reifert at noon that day to investigate the possibility that the three suspects captured after the second robbery—Mr. Chapman, Mr. Wright, and Mr. Pezet, all of the 305th Security Police Squadron stationed at Grissom Air Force Base—were also involved in the first robbery. Detective Roland called the FBI post in Lafayette, Indiana, and asked FBI Special Agents Otto Johnson and Walt Valentine to assist him in his investigation.

Detective Roland, along with FBI Special Agents Johnson and Valentine, met AFOSI Special Agent Reifert in the AFOSI office at the base at noon. Also present were AFOSI Special Agent Dave Rish, Captain William Thomas, and Acting Base Commander Lt. Colonel Gaylor Winge. Detective Roland informed everyone about the details of the second robbery and why,

based on the similar modus operandi, he thought Mr. Wright, Mr. Chapman, and Mr. Pezet might have been involved in the first robbery. Detective Roland suggested that they interview all the security police officers on base who knew Mr. Wright, Mr. Chapman and Mr. Pezet. Everyone present, with the exception of Lt. Col. Winge, then broke up into investigative teams and began interviewing base personnel.[23] After completing the interviews, they met to review what had been discovered. The group decided [24] to seek authorization to search Mr. Wright's room on base.

Special Agent Reifert then contacted Major Brubaker, the Staff Judge Advocate for the base, and discussed the facts of the case and the idea of searching Mr. Wright's room. Major Brubaker told Reifert that he thought there was probable cause to conduct a search. Reifert then typed up a statement of probable cause along with a Search Authorization form and presented them to Lt. Col. Winge at his residence on base.[25] Reifert was not asked to, and did not, swear to the truth of the probable cause statement, but merely told Lt. Col.

**21.** At the suppression hearing, Reifert testified that he called Roland. Tr. of Nov. 2, 1988 at 67. In his deposition, Reifert had testified that Roland called him first. R.22 at 20. Detective Roland was never directly asked this question at the hearing. Tr. of Nov. 2, 1988 at 14–53.

**22.** Both bank robberies occurred in small rural towns on Friday evenings shortly after 5:00 pm. In both cases a white man was seen driving together with a black man around the time of the robbery. In both cases one gunman was black, wore a white hooded sweatshirt with the hood over his head and a partial mask over his mouth, wore white gloves, carried a semiautomatic pistol, had all the customers lie on the floor, jumped over the counter, had one teller stay up, and gave the teller a small bag to put the money in. When the gunman left both robberies, he told the customers and employees not to get up for ten minutes because he had friends outside watching.

One difference was that in the first robbery only the black man entered the bank, while in the second robbery both the black man and the white man entered the bank. Tr. of Nov. 2, 1988 at 18–20.

**23.** It is unclear what the AFOSI's role was in the interviewing process. In his deposition, Special Agent Reifert testified that the AFOSI was an "assisting agency" and the ISP was the "lead agency." R.22 at 14. At the suppression hear-

ing, Reifert refused to characterize the ISP as the lead agency, and suggested that it was a cooperative investigation among the ISP, FBI and AFOSI. Tr. of Nov. 2, 1988 at 69–72.

**24.** When Special Agent Reifert was asked at his deposition whose idea it was to search Mr. Wright's room, Reifert responded:

Well we had—we worked throughout the day. It—there were several teams established with the FBI agents and Ken Roland and myself taking turns interviewing these people. After we completed some interviews we would discuss our options—where we should proceed next. Alright, I'm not sure any one person decided to search Wright's room or any one person decided to search Chapman's house on base. It was probably a group decision that— that we came [to] together.

R.22 at 21.

**25.** AFOSI Special Agent Reifert presented the following probable cause statement to Lt. Col. Winge in support of his request for authorization to search.

PROBABLE CAUSE: On 3 Jul 87, Sgt CHAPMAN, SrA Wright, and Sgt PEZET of the 305 Security Police Squadron were arrested for Bank Robbery by the Indiana State Police. During the course of their investigation and subsequent investigation by AFOSI and FBI it

Winge that the information was true to the best of his knowledge. Lt. Col. Winge found probable cause and authorized Special Agent Reifert, "with the assistance of such person or persons as may be necessary," to search Mr. Wright's room for "[a w]hite hooded sweatshirt with 'Kings' emblem on the front, any money stolen from the Wabash Valley Bank and Trust, Denver, IN, any handguns that may have been used in the robbery, laundry bags, a white pair of gloves and any other items of clothing possibly used in the Denver IN Bank Robbery." R.1 at 18.

While two Air Force security police officers secured the door to Mr. Wright's room, AFOSI Special Agent Reifert, FBI Special Agents Johnson and Valentine, and Indiana State Police Detective Roland searched the room. Among the items they found were $296 in U.S. currency, including bait money that had been taken in the first robbery, and Air Force registration papers for a 9mm pistol. Detective Roland took the seized evidence into his possession, transported it back to the State Police Post, and stored it there in an evidence locker.

### a. governmental search

Mr. Wright contends that the currency seized in the search of his quarters—particularly the bait money from the Denver robbery—should have been excluded from his trial because the search violated his Fourth Amendment rights. Mr. Wright contends that the involvement of state and federal law enforcement officials converted the search from a military search to a governmental [26] one requiring strict compliance with the Fourth Amendment. The district court agreed with Mr. Wright that the state and federal authorities "participated in the search in a significant way." R.28 at 8–9. However, the district court held that the search met all Fourth Amendment requirements by virtue of the fact that it comported with Military Rule 315. In drawing this conclusion, the court relied upon *United States v. Brown*, 784 F.2d 1033 (10th Cir.1986), in which a similar conclusion was drawn. However, in *Brown* the search authorization not only met the requirements of Military Rule 315, it also was supported by an oath. [27] In this case, however, the request for search authorization was not supported by oath or affirmation. We cannot conclude, therefore, that *Brown* is directly on point.

On the other hand, we cannot accept Mr. Wright's argument that the situation before us is comparable to instances where

---

was discovered that CHAPMAN was also involved in a robbery that occurred on 29 May 87, in Denver, IN. During the 29 May robbery CHAPMAN had a white male accomplice. The accomplice was described as a white male, black hair, mustache, dark compected [sic] possibly hispanic or Italian background by a witness. The witness also saw both CHAPMAN and the accomplice traveling in a Gold foreign make vehicle with Illinois license plates. A subsequent interview with CHAPMAN's mother disclosed CHAPMAN had a gold colored Toyota brand vehicle with Illinois license plates during the time frame of the 29 May robbery. Interviews with other Security Policeman revealed that CHAPMAN and SrA WRIGHT were close friends and spent considerable time together. In addition both the robbery on 3 July 87, in which the three were arrested and the robbery on 29 May had the same modus operandi used to commit both offenses. In the Denver In. robbery a pair of white gloves was used in the robbery and WRIGHT was issued a pair for work as a gate guard. Both individuals owned 9mm pistols and two were recovered when the three were arrested on 3 Jul 87.

The description given by the witness fits the physical characteristics and make-up of SrA WRIGHT.
R.22 at 19.

**26.** Mr. Wright characterizes the transformation as from a military search to a "federal" search. Of course, since *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), both state and federal searches must meet Fourth Amendment standards. The concern for whether a search is federal as opposed to state is only relevant in determining whether the particular requirements of Federal Rule of Criminal Procedure 41(c)(1) apply. *See, e.g., United States v. Maggitt*, 778 F.2d 1029, 1032–33 n. 2 (5th Cir.1985), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 548 (1986); *United States v. McCain*, 677 F.2d 657, 662 (8th Cir.1982). In this case the relevant requirement—oath or affirmation—is not limited to federal searches.

**27.** "The facts preclude Brown from contending that the testimony of the officer requesting the warrant was not put under oath by the base commander." *Brown*, 784 F.2d at 1037.

federal law enforcement officers participate with state [28] or foreign country officials [29] or private entities [30] in a search that does not comport with standards embodied in the federal constitution, statutes or judicial rule. In those instances, the procedures followed did not provide the defendant with protections of the calibre contemplated by federal law. By contrast, the procedures followed here, while decidedly different from those employed by the federal government in the civilian community, are standards grounded in the federal constitution's Fourth Amendment and in the Congress' prerogative to make rules and regulations for the governance of the land and naval forces of the United States. *See* U.S. Const. art. I, sec. 8 cl. 14 ("The Congress shall have Power ... [t]o make Rules for the Government and Regulation of the land and naval Forces").

It is too late in the day to suggest that the Fourth Amendment's basic protection against unreasonable searches and seizures does not apply to members of the armed forces.[31] Nevertheless, the military implementation of that guarantee is different from that employed in civilian matters. In civilian cases, the warrant requirement has been abrogated by judicial decision only in certain carefully described situations.[32] In the military situation, Congress "has pri-

mary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military." *Solorio v. United States,* 483 U.S. 435, 447, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987). Through delegation of authority to the President,[33] Congress has determined that an alternate procedure to a warrant issued by a magistrate is more compatible with the realities of military life.

The constitutional legitimacy of such military searches is hardly a novel proposition.[34] For instance, in *United States v. Grisby,* 335 F.2d 652 (4th Cir.1964), Judge Haynsworth upheld the admissibility of evidence procured by a military search and admitted as evidence in a civilian prosecution of a servicemember. He wrote,

> The Fourth Amendment prohibits unreasonable searches. Searches as authorized by a valid search warrant are not prohibited because not unreasonable. Searches reasonably incident to lawful arrests are also not prohibited, for they too are not unreasonable. And we can find no basis for holding that a search conducted by military authority, which was completely lawful and valid when made as a matter of military law, is unreasonable under the Constitution.

*Grisby,* 335 F.2d at 656.

**28.** *See, e.g., Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

**29.** *See, e.g., United States v. Marzano,* 537 F.2d 257 (7th Cir.1976) (Canada), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Wolf,* 601 F.Supp. 435 (N.D.Ill. 1984) (Grand Cayman Island).

**30.** *See, e.g., United States v. Koenig,* 856 F.2d 843 (7th Cir.1988) (search by Federal Express personnel); *United States v. Newton,* 510 F.2d 1149 (7th Cir.1975) (airline search).

**31.** *United States v. Muniz,* 23 M.J. 201, 204 (C.M.A.1987) ("There is no question that the Fourth Amendment to the Constitution applies to servicemembers."); *United States v. Stuckey,* 10 M.J. 347, 349 (C.M.A.1981); *see generally United States v. Brown,* 784 F.2d 1033, 1037 (10th Cir.1986); *Garrett v. Lehman,* 751 F.2d 997, 1002 (9th Cir.1985).

**32.** *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *see United*

States v. Rea, 678 F.2d 382, 386 (2d Cir.1982); *United States v. Lewis,* 504 F.2d 92, 100 (6th Cir.1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975).

**33.** *See* 10 U.S.C. § 836, which provides:

(a) Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, military commissions and other military tribunals, and procedures for courts of inquiry, may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.

(b) All rules and regulations made under this article shall be uniform insofar as practicable and shall be reported to Congress.

**34.** *See United States v. Brown,* 784 F.2d 1033 (10th Cir.1986); *Wallis v. O'Kier,* 491 F.2d 1323 (10th Cir.), *cert. denied,* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974).

Under Military Rule of Evidence 315,[35] an investigatory search of a member's per-

**35. Rule** 315. Probable Cause Searches

(a) **General rule.** Evidence obtained from searches requiring probable cause conducted in accordance with this rule is admissible at trial when relevant and not otherwise inadmissible under these rules.

(b) **Definitions.** As used in these rules:

(1) **Authorization to search.** An "authorization to search" is an express permission, written or oral, issued by competent military authority to search a person or an area for specified property or evidence or for a specific person and to seize such property, evidence, or person. It may contain an order directing subordinate personnel to conduct a search in a specified manner.

(2) **Search warrant.** A "search warrant" is an express permission to search and seize issued by competent civilian authority.

(c) **Scope of authorization.** A search authorization may be issued under this rule for a search of:

(1) **Persons.** The person of anyone subject to military law or the law of war wherever found;

(2) **Military property.** Military property of the United States or of nonappropriated fund activities of an armed force of the United States wherever located;

(3) **Persons and property within military control.** Persons or property situated on or in a military installation, encampment, vessel, aircraft, vehicle, or any other location under military control, wherever located; or

(4) **Nonmilitary property within a foreign country.**

(A) Property owned, used, occupied by, or in the possession of an agency of the United States other than the Department of Defense when situated in a foreign country. A search of such property may not be conducted without the concurrence of an appropriate representative of the agency concerned. Failure to obtain such concurrence, however, does not render a search unlawful within the meaning of Mil.R.Evid. 311.

(B) Other property situated in a foreign country. If the United States is a party to a treaty or agreement that governs a search in a foreign country, the search shall be conducted in accordance with the treaty or agreement. If there is no treaty or agreement, concurrence should be obtained from an appropriate representative of the foreign country with respect to a search under paragraph (4)(B) of this subdivision. Failure to obtain such concurrence or noncompliance with a treaty or agreement, however, does not render a search unlawful within the meaning of Mil.R.Evid. 311.

(d) **Power to authorize.** Authorization to search pursuant to this rule may be granted by an impartial individual in the following categories:

(1) **Commander.** A commander or other person serving in a position designated by the Secretary concerned as either a position analogous to an officer in charge or a position of command, who has control over the place where the property or person to be searched is situated or found, or, if that place is not under military control, having control over persons subject to military law or the law of war;

(2) **Military judge.** A military judge or magistrate if authorized under regulations prescribed by the Secretary of Defense or the Secretary concerned.

An otherwise impartial authorizing official does not lose that character merely because he or she is present at the scene of a search or is otherwise readily available to persons who may seek the issuance of a search authorization; nor does such an official lose impartial character merely because the official previously and impartially authorized investigative activities when such previous authorization is similar in intent or function to a pre-trial authorization made by the United States district courts.

(e) **Power to search.** Any commissioned officer, warrant officer, petty officer, non-commissioned officer, and, when in the execution of guard or police duties, any criminal investigator, member of the Air Force security police, military police, or shore patrol, or person designated by proper authority to perform guard or police duties, or any agent of any such person, may conduct or authorize a search when a search authorization has been granted under this rule or a search would otherwise be proper under subdivision (g).

(f) **Basis for search authorizations.**

(1) **Probable cause requirement.** A search authorization issued under this rule must be based upon probable cause.

(2) **Probable cause determination.** Probable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched. A search authorization may be based upon hearsay evidence in whole or in part. A determination of probable cause under this rule shall be based upon any or all of the following:

(1) Written statements communicated to the authorizing officer;

(2) Oral statements communicated to the authorizing official in person, via telephone, or by other appropriate means of communication; or

(3) Such information as may be known by the authorizing official that would not preclude the officer from acting in an impartial fashion.

The Secretary of Defense or the Secretary concerned may prescribe additional requirements.

(g) **Exigencies.** A search warrant or search authorization is not required under this rule for search based upon probable cause when:

son or quarters may only be undertaken (absent exigent circumstances) [36] when the investigator presents the military commander with information establishing that there is probable cause to believe that the area sought to be searched contains evidence of unlawful activity. The investigator may present that information orally or in writing. There is no explicit requirement that the person presenting the information be under oath, although it appears to be the preferred practice.[37]

The United States Court of Military Appeals, the court recognized by both the Congress and the Supreme Court as having a particular expertise in this area,[38] has explained that the military search authorization procedure is a finely tuned accommodation of the servicemember's privacy interests grounded in the Fourth Amendment and the specific needs, dictated by military necessity, for good order and discipline in the armed forces. *See United States v. Stuckey*, 10 M.J. 347, 358–61 (C.M.A.1981). The relationship between a member of the armed forces and a commander is different from the relationship between a civilian and a magistrate. Members of the armed forces have considerably less of an expectation of privacy while living on a military installation, and a military commander has considerably more interest in being informed of all activities in the area under his command. As the Court of Military Appeals noted in *Stuckey:* "A military commander has responsibilities for

(1) **Insufficient time.** There is a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought;

(2) **Lack of communications.** There is a reasonable military operational necessity that is reasonable believed to prohibit or prevent communication with a person empowered to grant a search warrant or authorization and there is a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought;

(3) **Search of operable vehicle.** An operable vehicle is to be searched, except in circumstances where a search warrant or authorization is required by the Constitution of the United States, this Manual or these rules; or

(4) **Not required by Constitution.** A search warrant or authorization is not otherwise required by the Constitution of the United States as applied to members of the armed forces.

For purposes of this rule, a vehicle is "operable" unless a reasonable person would have known at the time of search that the vehicle was not functional for purposes of transportation.

(h) **Execution.**

(1) **Notice.** If the person whose property is to be searched is present during a search conducted pursuant to a search authorization granted under this rule, the person conducting the search should when possible notify him or her of the act of authorization and the general substance of the authorization. Such notice may be made prior to or contemporaneously with the search. Failure to provide such notice does not make a search unlawful within the meaning of Mil.R.Evid. 311.

(2) **Inventory.** Under regulations prescribed by the Secretary concerned, and with such exceptions as may be authorized by the Secretary, an inventory of the property seized shall be made at the time of a seizure under this rule or as soon as practicable thereafter. At an appropriate time, a copy of the inventory shall be given to a person from whose possession or premises the property was taken. Failure to make an inventory, furnish a copy thereof, or otherwise comply with this paragraph does not render a search or seizure unlawful within the meaning of Mil.R.Evid. 311.

(3) **Foreign searches.** Execution of a search authorization outside the United States and within the jurisdiction of a foreign nation should be in conformity with existing agreements between the United States and the foreign nation. Noncompliance with such an agreement does not make an otherwise lawful search unlawful.

(4) **Search warrants.** Any civilian or military criminal investigator authorized to request search warrants pursuant to applicable law or regulation is authorized to serve and execute search warrants. The execution of a search warrant affects admissibility only insofar as exclusion evidence is required by the Constitution of the United States or an applicable Act of Congress.

**36.** *See* Military Rule of Evidence 315(g).

**37.** *See United States v. Stuckey,* 10 M.J. 347, 363 (C.M.A.1981).

**38.** *See Schlesinger v. Councilman,* 420 U.S. 738, 758, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975); *Noyd v. Bond,* 395 U.S. 683, 694, 89 S.Ct. 1876, 1883, 23 L.Ed.2d 631 (1969); *see also Middendorf v. Henry,* 425 U.S. 25, 66, 96 S.Ct. 1281, 1302, 47 L.Ed.2d 556 (1976) (Marshall, J., dissenting).

investigation and for law enforcement that a magistrate does not possess. Also, he has responsibilities for the welfare and combat readiness of the personnel under his command." 10 M.J. at 359. Continued the court,

> Winthrop describes "custom" as "a uniform, known practice of long standing, which is also certain and reasonable." Winthrop, *Military Law and Precedents* (1920 Reprint), 42. "Military custom," so defined, has long granted military commanders broad powers of search and seizure. *See United States v. Middleton,* [10 M.J. 123 (C.M.A.1981)]. The existence of that custom clearly imposes some limitation on a serviceperson's reasonable expectation of privacy.

*Id.* at 360. Consequently, while the "authorization to search" is sometimes referred to in casual parlance as a "warrant" and the commander is referred to as a "magistrate," such terminology, noted the Court of Military Appeals, does not reflect the theoretical or practical reality of the situation. As that court wrote in *Stuckey:*

> In our view servicepersons have never expected that, before authorizing a search, a military commander would comply with the warrant procedure required of a federal magistrate. Indeed, except to a literalistic and loyal reader of this Court's opinions, equating a military commander with a judicial officer would probably have seemed odd. Instead, the commander's long-recognized power to authorize searches within the area of his command is generally viewed as derived from and correlative with his position and responsibilities in the military community—which, of course, is "a specialized society separate from civilian society." *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974). Accordingly, a commander's authorization of a search has never been equated with the judicial-type procedure which comes within the contemplation of the warrant clause of the Fourth Amendment.

10 M.J. at 360.

The oath requirement is no technical or trivial component of the Warrant Clause of the Fourth Amendment. It is designed to ensure the truthfulness of the information considered by the magistrate by inducing the supplier of that information to consider carefully his submission. Nevertheless, in the military environment, the Warrant Clause plays no part in the determination of probable cause. The alternate procedure, the Court of Military Appeals has noted, provides its own safeguards for insuring the accuracy of the information provided. As the court noted in *Stuckey,* unlike the civilian magistrate, the military commander oftentimes knows a good deal about the subject of the search prior to being presented with the investigator's information. The military commander can be expected to assess the investigator's information in light of that broader background. The commander may also rely on a wider variety of sources. Chief Judge Everett wrote:

> Unlike a civilian magistrate, the military commander who is requested to authorize a search often will already have acquired information that is relevant to a determination of probable cause. He may have seen police reports concerning a suspect or know of his reputation, prior convictions, or nonjudicial punishments. Some of the commander's information may be of a hearsay nature and not admissible in court, but nevertheless of sufficient reliability so that, if properly presented in an affidavit, it would help support a search warrant. *Cf. Jones v. United States,* [362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)]; *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Brinegar v. United States,* [338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)]. Some of the evidence already in the commander's possession may consist of documents which are not prepared under oath but which—under hearsay exceptions for official records or business entries—would be admissible at a trial to establish guilt or innocence.
>
> ... Must the commander who possesses this information, in turn, refer the request for search authority to a higher

echelon and then submit to the superior commander his own sworn recitation of the information which he possesses? Further, if official records or business records contain information relevant to a probable cause decision, will it be necessary that someone swear before the commander that the documents say what they purport to say, rather than merely submitting the records to the commander for his consideration?

10 M.J. at 363. Moreover, there are significant additional safeguards, both legal and practical, to ensure that the information presented to the commander is true and that the commander considers the information carefully. As the district court noted, a servicemember who supplies false information to a commander is subject to court-martial. Moreover, the commander is subject to significant adverse consequences for sanctioning an unwarranted invasion of privacy. As Chief Judge Everett noted:

In promulgating paragraph 152 of the Manual the President may also have recognized that inherent in the command structure are some safeguards against a commander's indiscriminate invasion of the privacy of his subordinates. For one thing, combat readiness of troops depends in large part upon their motivation, but discipline and punishment cannot alone develop the necessary motivation. Leadership is also required, and one aspect of successful leadership is concern for the welfare of subordinates. Loyalty in a military unit, as in other organizations, is a two-way street. A commander who approves—or even tolerates—arbitrary invasions of the privacy of his subordinates is not demonstrating the brand of leadership likely to command the loyalty or produce the high morale associated with a combat-ready organization. Accordingly, a commander has some incentive to act reasonably and with sound judgment in acting on requests for searches and seizures which involve his personnel. Moreover, repeated failures by a commander to respect the Fourth Amendment rights of

his troops might become a basis for a "complaint of wrongs" under Article 138 of the Uniform Code, 10 U.S.C. § 938, or, in the extreme case, even for a prosecution for dereliction of duties as a commander. *See* Article 92, UCMJ, 10 U.S.C. § 892.

10 M.J. at 359–60.

■ We need not confront in this case a situation where there is no legitimate military interest in the search and the application to the commander is simply an effort to evade the Warrant Clause. Indeed, given the obvious military interest in all matters that occur on a military installation, such a situation may be hypothetical. In this case, there is no indication that the application for permission to search directed to the base commander was intended to circumvent the warrant requirement. Nor are we confronted with a situation in which the participation of military authorities in the investigation can be considered "pro forma." While the record reflects that the investigation was a joint federal, state, and military enterprise, the record simply does not support a suggestion that there was no real military investigative interest. Common sense suggests the contrary. The commission of serious crimes of violence by military personnel who are members of a unit engaged in providing security to a base containing warplanes and in providing personal security to the Vice–President of the United States [39] is a matter of utmost concern to the cognizant commander. Because a procedure contemplated by the federal constitution was legitimately implemented by those permitted to use it, the civilian federal officers were under no obligation to engage in the duplicative effort of securing a warrant from a magistrate.

b. probable cause requirement under Military Rule of Evidence 315

Mr. Wright's second challenge is to the district court's ruling that Lt. Col. Winge had probable cause to authorize the search. Mr. Wright contends that the evidence that

---

**39.** The record reflects that one of the arrested airmen had just recently been part of a security detail to protect the Vice–President. Tr. of Nov. 2, 1988 at 83.

Special Agent Reifert presented to Lt. Col. Winge was both insufficient and stale.

■■■ Regarding the sufficiency of the evidence, the probable cause standard under Military Rule of Evidence 315(f) is the same "totality of the circumstances" standard that the Supreme Court adopted in *Illinois v. Gates:*[40]

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.

462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The district court's task in this case was therefore also defined by *Gates:* "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). We review de novo the district court's judgment on this matter. *United States v. Lamon,* 930 F.2d 1183, 1187 (7th Cir.1991); *United States v. McKinney,* 919 F.2d 405, 408 n. 2 (7th Cir.1990).[41]

■■■ As the district court noted, AFOSI Special Agent Reifert submitted a statement to Lt. Col. Winge that alleged that (1) Mr. Wright, along with Mr. Chapman and Mr. Pezet—all members of the 305th Security Police Squadron—had been arrested for bank robbery by the Indiana State Police; (2) Mr. Chapman has also been involved in a bank robbery five weeks earlier in Denver, IN; (3) in the earlier robbery, Mr. Chapman had an accomplice who matched Mr. Wright's description; (4) Mr. Chapman and Mr. Wright were close friends and spent considerable time together; (5) there was a similar modus operandi for both robberies; (6) Mr. Wright owned a 9mm gun such as those recovered when Mr. Wright, Mr. Chapman, and Mr. Pezet were arrested for the later robbery;[42] and (7) Mr. Wright had been issued white gloves for his work as a gate guard, and white gloves were used in the earlier robbery. The information provided Lt. Col. Winge with more than substantial basis for concluding that a search of Mr. Wright's quarters would reveal money stolen from the banks as well as other items connected with the robberies.

Nevertheless, Mr. Wright contends that the information that Special Agent Reifert provided to Lt. Col. Winge was stale and therefore could not have supported a finding of probable cause that items from the May 29 robbery would still be in Mr. Wright's quarters on July 6, the date of the search. Although only three days had passed since the July 3 robbery, thirty-seven days had passed since the May 29 robbery. In particular, Mr. Wright contends that in the context of a bank robbery, a "highly consumable" item such as cash is not likely to remain in one place. In support of this argument, Mr. Wright cites *United States v. Steeves,* 525 F.2d 33 (8th Cir.1975), in which the Eighth Circuit remarked that eighty-seven days after a bank robbery "there was little reason to believe that any of the bank's money or the money bag would still be in the [defendant's]

**40.** S. Saltzberg, L. Schinasi, D. Schlueter, *Military Rules of Evidence Manual* 365 (Drafters' Analysis (1984)) (3d ed. 1991).

**41.** While we note that recently some doubts have been expressed as to the continuing validity of this standard of review, *United States v. Certain Real Property, Commonly known as 6250 Ledge Road, Egg Harbor, WI,* 943 F.2d 721, 723 (7th Cir.1991); *United States v. Leung,* 929 F.2d 1204, 1208 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991); *United States v. Chaidez,* 919 F.2d 1193, 1196 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2861, 115·L.Ed.2d 1028 (1991) (defendant Chavira) and *cert. denied,* —— U.S. ——, 112

S.Ct. 209, 116 L.Ed.2d 167 (1991) (defendant Chaidez); *United States v. McKinney,* 919 F.2d 405, 418–23 (7th Cir.1990); *United States v. Romo,* 914 F.2d 889, 897–98 (7th Cir.1990) (and cases cited therein), *cert. denied,* —— U.S. ——, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991), the law in this circuit remains unchanged.

**42.** Special Agent Reifert testified at his deposition that 9mm guns were not issued by the Air Force at that time, and that for their duties as security police officers, Mr. Wright and Mr. Chapman would only have been issued .38 revolvers and M16 rifles which they had to pull from and return to the armory each duty day. R.22 at 26.

home." *Steeves,* 525 F.2d at 38.[43] In response, the government cites *United States v. Jackson,* 756 F.2d 703, 705 (9th Cir.1985), in which the Ninth Circuit upheld a home search for stolen bank currency two months after the robbery. "The two month interval between the robbery and the search of [the defendant's] apartment did not dispel the probability that the currency, or some of it, remained in [the defendant's] apartment." *Id.*

The district court properly noted that this court has recently limited the role that staleness plays in the probable cause calculus. *United States v. Certain Real Property, Commonly known as 6250 Ledge Road, Egg Harbor, WI,* 943 F.2d 721, 724 (7th Cir.1991).[44] The district court was also correct to rely on the fact that Mr. Wright had just been apprehended for his participation in the later robbery, and thus this case involved continuing criminal activity. As we have said, "'where the affidavit recites facts indicating ongoing, continuous criminal activity, the passage of time becomes less critical.'" *Lamon,* 930 F.2d at 1188 (quoting *United States v. Shomo,* 786 F.2d 981, 984 (10th Cir.1986) (dicta)).

Furthermore, because Mr. Wright was an airman stationed on base, Lt. Col. Winge was aware that Mr. Wright had few places other than his quarters available to him to hide the stolen money and few inconspicuous opportunities to "consume" large amounts of cash on base. In light of these facts and the fact that the evidence suggested that Mr. Wright was involved in a continuing criminal activity, we conclude that the thirty-seven-day-old information regarding the first bank robbery was not old enough to undermine Lt. Col. Winge's substantial basis to believe that a search of Mr. Wright's quarters would reveal money

stolen from the Denver bank as well as other evidence of that crime.

### c. good faith exception

The district court held that, even if the search of Mr. Wright's quarters violated his Fourth Amendment rights, the evidence would be admissible under the good faith exception to the exclusionary rule articulated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and its companion case, *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). R.28 at 9–12. On appeal, Mr. Wright contends that this is not a viable alternative basis for the district court's holding because the statement that AFOSI Special Agent Steven Reifert submitted in support of his request for authorization to search Mr. Wright's quarters was "'so lacking in indicia of probable cause as to render an official belief in its existence entirely unreasonable.'" Appellant Wright's Br. at 30 (quoting *Leon,* 468 U.S. at 924, 104 S.Ct. at 3421). However, as we have already determined, *supra* pp. 1372–1373 (listing items in probable cause statement), the substance of Special Agent Reifert's statement was more than sufficient to provide probable cause to believe that evidence relating to the first robbery could be found in Mr. Wright's quarters. Also, Mr. Wright offered no evidence that Special Agent Reifert was dishonest or reckless in preparing the statement. For these reasons, we agree with the district court that, even if the search of Mr. Wright's quarters violated the Fourth Amendment, the investigating officers' reasonable good-faith reliance on that authorization justified the district court's denial of Mr. Wright's motion to suppress.[45]

---

**43.** Nevertheless, the Eighth Circuit upheld the search warrant in *Steeves* because other less consumable items of evidence, such as guns used in the robbery, were likely to still be found at the residence. 525 F.2d at 38.

**44.** *Accord United States v. Lamon,* 930 F.2d 1183, 1187–88 (7th Cir.1991); *United States v. McNeese,* 901 F.2d 585, 596–97 (7th Cir.1990); *United States v. Batchelder,* 824 F.2d 563, 564 (7th Cir.1987) ("The age of the information supporting the application for a warrant is a factor

that a magistrate should consider. It is, however, only one factor. If other factors indicate that the object of the search will still be on the premises, then the magistrate should not hesitate to issue a warrant.").

**45.** Mr. Wright also suggests that the good faith exception has no application under the Military Rules of Evidence. To the contrary, in 1986, Military Rule of Evidence 311 was amended to provide:

### 2. Denial of surrebuttal testimony

Finally, Mr. Wright contends that the district court abused its discretion in refusing to allow him to present surrebuttal testimony in support of his alibi defense. In his case in chief, Mr. Wright and his parents testified that, at approximately the time of the Denver bank robbery, he was at their home in Indianapolis. He also presented evidence that he had received a collect call at their home at 6:07 p.m. from the Grissom Air Force Base home of John and Terri Stout. Mr. Wright claimed that Ms. Stout had made the collect call and that they were "involved" at the time, but not romantically. Tr. of June 26, 1989 at 774; Tr. of June 27, 1989 at 827. In rebuttal, the government presented the testimony of both Mr. Stout and his former wife, who testified as Terri Lombardo. Both Mr. Stout and Ms. Lombardo testified that Mr. Wright actually placed the collect call to his parents' home on the afternoon of the robbery. Ms. Lombardo also testified that she and Mr. Wright had become "close friends" as problems developed in her marriage, but she denied having an affair with him. *Id.* at 910. Ms. Lombardo acknowledged calling Mr. Wright a number of times to discuss her marital problems, but testified that she had never placed a collect call to his parents' residence.

Following Ms. Lombardo's testimony, Mr. Wright sought to present surrebuttal in the form of the testimony of his sister, Lori Compton. Ms. Compton would have testified that, shortly after Mr. Wright was arrested in July 1987, Ms. Lombardo "indicated that she was in love" with Mr. Wright and that "she was concerned about him." Tr. of June 28, 1989 at 963. Mr. Wright's counsel contended that the proffered statements "would be admissible under the state of mind exception to the hearsay rule and they are relevant to her bias or her ulterior motive for her statement in July of 1987 which she has continued to adopt through" her trial testimony. *Id.* Asked by the court why Ms. Lombardo's being in love with Mr. Wright would have created bias, defense counsel responded, "She was married to John Stout at the time. It gave her a motive to conceal the actual events of May 29th, 1987, as I see them." *Id.* The court, however, concluded that this theory of bias was not "a reasonable inference." *Id.* Furthermore, the court observed that Ms. Lombardo's testimony about her relationship with Mr. Wright "was quite consistent with" Mr. Wright's own testimony. *Id.* at 964. The court therefore refused to allow the proffered surrebuttal.

We shall not reverse a trial court's decision regarding the admissibility of surrebuttal testimony unless the trial court abuses its discretion. *See United States v. Gaertner,* 705 F.2d 210, 217 (7th Cir.1983) ("Indeed, great deference is accorded to the discretion and judgment of the trial court when granting and/or denying a party's motion for rebuttal or surrebuttal testimony."), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984). District courts are authorized to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Fed. R.Evid. 611(a).

 There was no abuse of discretion in this case. As did the district court, we see little significant difference between Mr. Wright's and Ms. Lombardo's testimo-

---

(3) Evidence that was obtained as a result of an unlawful search or seizure may be used if:
. . . .
 (C) The officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith shall be determined on an objective standard.

Military Rule of Evidence 311(b)(3)(C). The Drafters' Analysis reveals that this addition was designed to incorporate the good faith exception that the Supreme Court created in *Leon* and *Sheppard.* S. Saltzberg, L. Schinasi, D. Schlueter, *Military Rules of Evidence Manual* 255–56 (Drafters' Analysis (1986)) (3d ed. 1991). *See also United States v. Johnson,* 23 M.J. 209, 212 n. * (C.M.A.1987).

ny regarding their relationship. Therefore, assuming arguendo that the proffered testimony would have been admissible,[46] it is indeed speculative whether it would have demonstrated a bias *against* the defendant. In any event, the jury was aware that Ms. Lombardo and her husband were having marital difficulties during the period just after the robberies; it also was aware that Ms. Lombardo and Mr. Wright were seeing each other socially and talking on the telephone a good deal. Furthermore, during closing arguments, Mr. Wright's counsel told the jury that Ms. Lombardo "came up with this story about Jack making a collect call. She came up with it on July 29th, 1987 as a further effort to conceal her relationship with my client and she has clung to that." Tr. of June 28, 1989 at 1012. Therefore, even if the district court did commit error in refusing to admit the statement, the issue was still before the jury and, given the weight of the evidence against the defendant, any error was clearly harmless.

### Conclusion

For the foregoing reasons, the judgments of the district court are affirmed.

AFFIRMED.

---

**46.** In *United States v. Jackson,* 780 F.2d 1305, 1315 (7th Cir.1986), this court held that
　[i]n determining whether statements relative to the declarant's state of mind are admissible under Fed.R.Evid. 803(3), three requirements must be satisfied: (1) "the statements must be contemporaneous with the ... event sought to be proven;" (2) "it must be shown that the declarant had no chance to reflect—that is, not time to fabricate or to misrepresent his thoughts;" and (3) "the statements must be shown to be relevant to an issue in the case." *United States v. Layton,* 549 F.Supp. 903, 909 (N.D.Cal.1982).
(citations omitted). It is not at all clear from defense counsel's proffer that Ms. Lombardo's statements would meet these criteria.