**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lester Mack BROWN, Jr., Andrew Michael Joseph Santillanes, and William Berl Brown, Defendants-Appellants.**

**Nos. 85–1407, 85–1436 and 85–1439.**

United States Court of Appeals,
Tenth Circuit.

Feb. 27, 1986.

Presiliano A. Torrez, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., and David N. Williams, Asst. U.S. Atty., with him on brief), for plaintiff-appellee.

Edwin Macy, Asst. Federal Public Defender, Albuquerque, N.M., for defendant-appellant, Lester Mack Brown, Jr.

Frank A. Baca, Albuquerque, N.M., for defendant-appellant Andrew Michael Joseph Santillanes.

Shannon Robinson, Albuquerque, N.M., for defendant-appellant William Berl Brown.

Before BARRETT and McKAY, Circuit Judges, and THEIS,* District Judge.

BARRETT, Circuit Judge.

These consolidated appeals arise from the criminal convictions of Lester Brown Jr., Andrew Santillanes, and William Brown for violations of 18 U.S.C. § 2031, rape, and 18 U.S.C. § 2, aiding and abetting rape.

The victim, Arleen Paul, was a 20-year old student at the Job Corps campus in Albuquerque, New Mexico. On the evening of June 9, 1984, Ms. Paul joined several fellow students in a nearby park to talk. Soon, another friend of Ms. Paul's drove up with two men and invited several of those in the park to join them in the car and ride around. Ms. Paul accepted the invitation and got into the car. The two men already in the car were Lester Brown and Andrew Santillanes. Andrew Santillanes sat next to Arleen Paul in the back seat and started making sexual advances toward her which she rebuffed. (R., Vol. III, p. 151).

After driving for awhile the group entered Kirtland Air Force Base. Lester Brown resided in military housing on the base. Lester Brown's wife was a member of the military service although she was away on maneuvers on this particular evening.

Upon arriving at Lester Brown's house, the group encountered William Brown, Lester's brother. A party of sorts began; several people were smoking marijuana, drinking beer, and watching television. Arleen Paul testified that she only partook of half

---

* The Honorable Frank G. Theis, United States District Judge for the District of Kansas, sitting by designation.

a can of beer. During the party, Andrew Santillanes continued to pursue Ms. Paul. (*Id.* at p. 156).

After a time, Ms. Paul asked one of her friends if they could leave. The friend indicated that she would have to talk with another girl about leaving. Ms. Paul, Lester Brown, and Andrew Santillanes then went outside to look at Brown's dog. When Ms. Paul reentered the house, she found that her friends had already departed. The other girls left, thinking Ms. Paul was with a third Job Corps friend who had been with them in the house. This was not the case.

Realizing that she was alone in the house with the three appellants, Arleen Paul went to the front door and attempted to leave. Lester Brown blocked her way. (*Id.* at p. 161.) Then Andrew Santillanes pushed Ms. Paul down the hallway to a back bedroom. He pushed her into the bedroom, closed the door, and demanded that she take off her clothes. A struggle followed and Lester and William Brown entered the room. (*Id.* at p. 165.) All three men were holding her down and Andrew Santillanes drew a knife and cut off Ms. Paul's leotard. Andrew Santillanes then raped Ms. Paul after the other two men had left the room. Mr. Santillanes held Ms. Paul by the hair and slapped her about the face. Each man in turn returned to the bedroom and raped Ms. Paul. Andrew Santillanes forced Arleen Paul to engage in two additional acts of intercourse before she devised a plan of escape. Ms. Paul pled with Santillanes to let her go to the bathroom. After locking herself in the bathroom, Ms. Paul cut through the screen with a comb, climbed through the window, and ran to a neighbor's house naked at about 5 a.m.

The military police were summoned and, after speaking with Ms. Paul who told them three men had raped her, approached Brown's house. The officers knocked and were allowed to enter the house. (*Id.* at p. 80.) The officers immediately noticed marijuana and paraphernalia in the living room. William Brown was in the living room and one of the officers asked him to get Lester, who was asleep in the back bedroom. (*Id.* at p. 92.) Lester was called by William but did not respond. Lester was then awakened by his brother and one of the officers. On the way down the hallway to retrieve Lester Brown, a bloody bedspread and women's clothing were noticed in one of the bedrooms. At that point the third man had not been located.

The on-call Judge Advocate General (JAG) officer was telephoned, the situation was related to him, and the JAG officer indicated that probable cause to search existed. The base commander was then telephoned, the situation was conveyed to him by a military police officer under oath, and the commander orally authorized a search of the premises. The search was conducted and Andrew Santillanes was found hiding behind a freezer in the back room with a switchblade in his pocket. Soon thereafter, additional officers and the FBI arrived to interview witnesses and collect evidence.

The appellants were tried jointly and convicted by a jury. Each appellant raises different issues on appeal. Lester Brown challenges the search of his home and claims that the evidence seized in the search should have been excluded. Andrew Santillanes and William Brown both argue that the trial court erroneously denied their motions to sever and grant them separate trials. Andrew Santillanes also contends that the trial court erred in admitting evidence of his prior convictions. William Brown contends that the trial court's failure to sentence him under the Youth Corrections Act was error.

### DISCUSSION

#### A.

Lester Brown challenges the search of his home and the evidence taken therefrom on the following grounds: (1) that the search should have been carried out in accordance with Fed.R.Crim.P. 41, and (2) that the search violated Lester Brown's Fourth Amendment rights. The search was authorized and conducted in accord-

ance with Military Rule of Evidence 315. Lester Brown contends that because all of the suspects and the victim were civilians and participation by the FBI was involved that the requirements of Rule 41 should control rather than Military Rule of Evidence 315.

█ Lester Brown argues that in spite of the fact that the incident took place inside military housing on a military reservation that military procedures should not have been used. Brown has recognized that it is a base commander's duty to maintain the order, security, and discipline necessary to military operations. *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Furthermore, the base commander is responsible for all military property located on a military installation. *United States v. Stuckey*, 10 M.J. 347 n. 9 (1981).

Because of the unique circumstances surrounding military bases, procedures have been adapted to fit the military system of justice, which, in a technical sense, are not identical to the procedures used in the civilian system of justice. Military Rule of Evidence 315 is the Armed Forces' counterpart of Fed.R.Crim.P. 41. The military rule provides that if probable cause is required then "authorization to search" may be required. Authorization to search is defined as "[A]n express permission, written or oral, issued by competent military authority to search a person or an area for specified property or evidence or for a specific person and to seize such property, evidence, or person." Mil.R.Evid. 315(b)(1). This "authorization to search" is the military equivalent of what is known in civilian parlance as a search warrant.

Military Rule of Evidence 315 includes a definition of probable cause which is substantially identical to probable cause in non-military situations. The Rule specifies who may authorize searches: various "impartial" individuals. The Rule allows search authorization to be based on hearsay evidence. Mil.R.Evid. 315(f)(2). Probable cause under the Military Rule can be based on any or all of the following:

1) Written statements communicated to the authorizing officer;

2) Oral statements communicated to the authorizing official in person, via phone, or by other appropriate means of communication; or

3) Such information as may be known by the authorizing official that would preclude the officer from acting in an impartial fashion.

Whenever feasible, the Rule requires the executing agent to notify the person whose property is being searched about the search authorization and its terms. An inventory of the items seized in the search is to be made and, when possible, furnished to the person. Mil.R.Evid. 315(h)(1) and (2).

Upon comparison, the following elements of Fed.R.Crim.P. 41 demonstrate the similarity of the two rules. Fed.R.Crim.P. 41 calls for the issuance of a search warrant by a federal magistrate after the execution of affidavits establishing probable cause. Warrants can be issued upon sworn oral testimony if the circumstances dictate. If oral testimony is communicated over a telephone or by means other than in-person, a duplicate original is to be prepared by the person requesting the warrant and is to be read verbatim to the magistrate. The magistrate is also to transcribe an original warrant. Inventories are also to be executed and given to the person whose property was taken.

Military Rule 315 and Fed.R.Crim.P. 41 are, in substance, very similar. In one respect, though, there is a divergence. The Military Rule allows one who seeks search authorization to present testimony without a simultaneous writing or transcription. The Military Rule also authorizes that permission to search may be given orally or in writing. Under the Federal Rules contemporaneous writings are necessary to facilitate a review if questions as to the propriety of a warrant should arise at a later time. If Lester Brown's argument—that only the Federal Rules are applicable because of civilian involvement—has any merit, it is on this point alone.

In reviewing these procedures, we must determine whether their use by the military police did any violence to Brown's Fourth Amendment rights, for it is these rights that Rule 41 was designed to protect. Brown does not draw this court's attention to any particular Fourth Amendment rights which were allegedly violated. He does not claim that the search was unreasonable; nor that the search was not supported by probable cause. (He does make such an argument indirectly, however, by asserting that because no testimony was put in written form, nothing supports the probable cause determination.) Furthermore, Brown does not assert that the base commander who authorized the search was less than the equivalent of a neutral and detached magistrate. The facts preclude Brown from contending that the testimony of the officer requesting the warrant was not put under oath by the base commander. Lester Brown points to no procedures which were used that prejudiced him in any way.

This court has heretofore held that under military rules oral affidavits and oral authorization of search warrants without contemporaneous writings are free from any constitutional infirmity. *Wallis v. O'Kier*, 491 F.2d 1323, 1325 (10th Cir.), *cert. denied*, 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974). In *Wallis* the court held, "There seems to be no doubt but that an express provision of the military law that probable cause could be shown by oral statements would be valid." *Id.* Also, pertinent to the resolution of this issue is a finding of the District Court for the Eastern District of Virginia, "[T]hat as long as the military respects the rights guaranteed by the Fourth Amendment's prohibition against unreasonable searches and seizures, the military need not be bound by all of the procedural formalities that are imposed upon civilian law enforcement agencies." *United States v. Rogers*, 388 F.Supp. 298, 301 (E.D.Va.1975).

■ Here there was nothing unreasonable about the military's procedure. After speaking with Arleen Paul who claimed she had been raped repeatedly by three men, the military police went to Brown's house. When William Brown invited the military police officers into the house they immediately saw marijuana and drug paraphernalia. Inquiring about the whereabouts of the other two men, the police were told that Lester Brown was asleep in a back bedroom. The military police had William Brown try to rouse Lester. When he could not they walked down the hall to awaken him. While going down the hallway, the police observed a bloody bedspread and women's clothing thrown askew in another room. The JAG officer on duty was called by one of the officers from Brown's house. Under oath, the officer related to the JAG officer what he had found at the residence. The JAG officer felt that probable cause existed based on these facts: a naked, highly distraught woman was running through the street at an early hour of the morning claiming that she had been raped, the presence of the drugs, and the other incriminating information.

The JAG officer directed the military police officer to call the commander of the base and relate the facts to him. The officer called the commander, retold his findings under oath, and the commander then gave oral authorization for a search. The search authorization described the premises to be searched and items to be seized with sufficient particularity and was reduced to written form later that day. These procedures were in accord with the Military Rule of Evidence 315.

In conclusion, we hold that the procedures employed here did not violate Lester Brown's Fourth Amendment rights. In evaluating the conduct of law enforcement officers, the standard against which that conduct is to be measured is, whether or not it comported with the Fourth Amendment. We hold that the evidence seized in the search of Lester Brown's military housing was properly admitted.

**B.**

Two of the appellants, Andrew Santillanes and William Brown, contend that the

trial court erred by failing to grant their motions for severance. They claim that the tremendous prejudice which resulted from trying all three men jointly could only have been cured by separate trials. Both contend that their defenses were irreconcilable, antagonistic, and mutually exclusive, mandating a severance. *United States v. Crawford,* 581 F.2d 489 (5th Cir.1978).

■ The grant of a severance is not a matter of right but is contingent upon a showing of prejudice. Fed.R.Crim.P. 14. Such a determination is within the discretion of the trial court. *United States v. Espinosa,* 771 F.2d 1382, 1408 (10th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985).

■ When a defendant seeks reversal because of irreconcilable, mutually exclusive defenses, the defendant must demonstrate that acceptance of one party's defenses tends to preclude the acquittal of the other. This showing requires that the guilt of one defendant tends to establish the innocence of the other. *United States v. McClure,* 734 F.2d, 484, 488 n. 1 (10th Cir.1984). Such a showing of definitive prejudice was not made in this case.

At trial, Andrew Santillanes testified that each time that he had intercourse with Ms. Paul that it was consensual. Lester Brown also claimed that Ms. Paul willingly had intercourse with him. William Brown denied any sexual contact with Arleen Paul. While two appellants claimed the defense of consent, all three also acknowledged that someone must have raped Ms. Paul and, therefore, one of the other appellants must have been guilty.

However, each appellant had no knowledge about what the other appellants did to or with Ms. Paul. Each man went into one of the back bedrooms by himself to be with Ms. Paul. None of the appellants knew what transpired between Ms. Paul and the other appellants because they were not present. Accordingly, while Andrew Santillanes could, for example, testify that Arleen Paul consented to have sex with him, Santillanes could not testify as to what transpired between Arleen Paul and William Brown or Lester Brown.

The jury had to weigh the testimony of each appellant against that of the victim. Ms. Paul was the only witness to testify relative to her association with each appellant. The testimony of each of the appellants was not mutually exclusive as against that of the other appellants inasmuch as an acquittal of one appellant would not automatically require the jury to return a verdict of guilty against the other two.

If the jury had believed any of the individual appellant's accounts it could have acquitted that appellant. The jurors would not have been required to render guilty verdicts against the other appellants if they had acquitted one. The jury could have returned verdicts of acquittal for all of the appellants if the jury had believed them. Issues of credibility existed between each appellant and Ms. Paul, not between the appellants.

■ Even though the testimony of the appellants was irreconcilable with the testimony of Arleen Paul, the testimony of the appellants was not irreconcilable one with the other. Irreconcilable testimony with the victim does not establish a cause for severance. The conflicting interests of the appellants did not create a dilemma that could have been resolved only by trying them separately. Conflicting interests or hostility between defendants tried jointly is not sufficient cause, *per se,* for separate trials. Actual prejudice must be demonstrated. The trial court properly denied the appellants' motions for severance. The appellants have failed to demonstrate any prejudice as a result of the denial of severance; without such a showing, no reversal is mandated. *United States v. Long,* 705 F.2d 1259, 1262–63 (10th Cir.1983); *United States v. Puckett,* 692 F.2d 663 (10th Cir. 1982) *cert. denied,* 459 U.S. 1091, 103 S.Ct. 579, 74 L.Ed.2d 939 (1983). The appellants' claim that severance would have improved their chances for acquittal is not sufficient cause. *United States v. Strand,* 617 F.2d 571 (10th Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). We

hold that denial of severance was not an abuse of the trial court's discretion.

### C.

Andrew Santillanes also contends that the trial court erred in admitting evidence of his prior convictions under Fed.R.Evid. 609(a). This rule provides:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant....

Santillanes had a prior conviction for burglary and at the time of trial he was on parole. Santillanes filed a pretrial motion indicating that he intended to testify wherein he sought to exclude evidence of this conviction. A ruling on the motion was deferred by the trial court. The court requested that the prosecutor approach the bench before venturing into the prior convictions.

The prosecutor did not, however, elicit this evidence. Instead, counsel for one of the other appellants elicited Santillanes' prior convictions from him without any forewarning to the court. This forced the trial court to rule on the admissibility of the prior conviction evidence after the evidence was before the jury. Santillanes objected to the evidence on the ground that it was improperly admitted; he immediately renewed his motion for severance and made a motion for a mistrial. The court overruled his objection and denied his motions.

Santillanes argues that the evidence was improperly admitted. Santillanes claims that the "after the fact" ruling by the trial court impermissibly prejudiced him. The court did, however, weigh the probative versus prejudicial value of the evidence. Immediately after the evidence was presented to the jury, the following exchange occurred:

> THE COURT: I was a little surprised when the prior conviction came in at that point, but having come in, I was going to admit it anyway, from what I've heard of the case, and it is a property crime isn't it?
>
> PROSECUTOR: Yes sir.
>
> THE COURT: A burglary offense which, in my judgment, that weighs somewhat on credibility and truthfulness and is not the same type of violent offense as this one. So I think it is probative enough, and on credibility, that the harm as done to the defendant is not so great that probative value is outweighed.

(R., Vol. IV, p. 193–194).

▮ From these remarks, it is evident that the trial court would have admitted the prior conviction regardless of which party had offered it. The trial court indicated on the record that the prior conviction was probative of Santillanes' truthfulness. Admission of this evidence was proper as was denial of the motions.

### D.

William Brown contends that because of his age, long history of alcoholism, and low I.Q. he should have been sentenced under the Youth Corrections Act, 18 U.S.C. § 4216. The Act confers upon the sentencing judge the power to determine whether the offender would benefit from treatment under the Act. During sentencing, the court entertained psychological test results, family history, and other information designed to show William Brown's suitability for sentencing under the Youth Corrections Act. However, the trial court concluded that there would be no benefit from using the Act in his case. (R., Vol. VI, p.20.)

▮ An appellate court generally is not empowered to review sentences. *United States v. Martinez*, 749 F.2d 601, 607 (10th Cir.1984). If sentences do not exceed the maximum limits, they are legal. *Unit-*

ed States v. Perry, 709 F.2d 1348, 1349 (10th Cir.1983). In this case, any term for years or life imprisonment was authorized under 18 U.S.C. § 2031. If William Brown believes that he is entitled to relief, he may seek that relief from the trial court pursuant to Fed.R.Crim.P. 35.

WE AFFIRM.