[No. A118151. First Dist., Div. Four. Sept. 26, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
COREY MARQUES JASMIN, Defendant and Appellant.

**COUNSEL**

John Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Joan Killeen, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**REARDON, J.**—After deliberating for four hours, a jury convicted defendant Corey Marques Jasmin, an airman stationed at Travis Air Force Base, of eight felony counts and found true various enhancements in connection with numerous, off-base offenses, including two counts of first degree murder (Pen.

Code,[1] § 187, subd. (a)) involving special circumstances (§ 190.2, subd. (a)(3)), one count of attempted murder (§§ 187, 664), three counts of second degree robbery (§ 211), and two counts of assault with a firearm (§ 245, subd. (a)(2)).

The trial court sentenced defendant, then age 22, to life in prison without the possibility of parole, together with an indeterminate sentence of 75 years to life, plus a determinate sentence of 48 years.

On appeal, defendant contends that the trial court erred in denying his motion to suppress evidence that was the product of a warrantless search of his on-base living quarters. Defendant also contends that the prosecutor committed misconduct in closing argument. We affirm.

## I. TRIAL EVIDENCE

A. *May 29, 2003 Robbery*

Shortly after midnight on May 29, 2003, Jennifer Major and Michelle Azzalina were working at Secrets Adult Superstore in Fairfield, which is approximately one block away from Travis Air Force Base. Also present was Kristina Olsen, a former employee, who was visiting Major and Azzalina. The store was under video surveillance by two video cameras. Major and Azzalina had been behind the counter when a slim African-American man with a military haircut entered the store. The man was wearing a dark shirt with a distinctive emblem on it and a dark bandana, tied in cowboy fashion, around his face. The man was carrying a rifle and said, "Give me the money." Major thought the man spoke with an accent, but she could not place it.

Initially, Major laughed at the demand because she thought it was a joke. The man then started to fiddle with his gun, causing a bullet to fall onto the floor. After this occurred, Major put about $700 into a bank deposit bag the man had placed on the counter. The man left and Major called the police. The responding police officer retrieved the bullet and the video surveillance tape of the incident. The video surveillance tape was shown to the jury.

Major later identified defendant as the robber in a photographic lineup. However, she put a question mark by his photograph because she was not "100 percent" certain. Major said she "recognized the person 100 percent," but she was afraid about making a mistake since she had been given a very clear admonishment about identifying the wrong person. Azzalina also identified defendant as the robber in a photographic lineup. Like Major, Azzalina

---

[1] All further undesignated statutory references are to the Penal Code.

placed a question mark next to defendant's photograph. Azzalina explained that she was not "100 percent" certain because the robber's face had been partially covered. Olsen positively identified a photograph of defendant. All three women selected the same photograph in the lineup. The photographs in the lineup were cropped to block off the lower portion of their faces.

B.  *June 4, 2003 Robbery, Assaults and Attempted Murder*

   1.  *Robbery*

In the early morning hours of June 4, 2003, Major was again working at Secrets Adult Superstore, this time with fellow coworkers Alberto Lopez and Peter Keys. There was also a customer in the store. Approximately 12:30 a.m., Major heard gunshots being fired just outside the store. She tried to run to the back of the store but the other employees were in her way. She dropped to the floor behind the counter, as Lopez and Keys ran to the back of the store. Major heard someone run into the store, the sound of voices, and then more gunshots fired inside the store. She heard the customer and the intruder, who sounded angry, speaking to each other, but she could not recall what they said.

The intruder ran to the counter and threw down the same bag used in the robbery that had occurred a week earlier. Major attempted to fill the bag with money without standing up. As she did so, she could see the intruder, who was wearing a ski mask that covered his entire face and head except for his eyes. From the intruder's voice and the form of his body, Major knew it was the same man from the first robbery. The man was upset about the amount of money put in the bag. The man held the gun to Major's face, called her a bitch, and asked where the rest of the money was located. After Major told the man there was no additional money in the store, he left. Major immediately called the police. A responding police officer retrieved a video surveillance tape of the incident, which was shown to the jury. At trial, Major identified defendant's gun as the same weapon used in both robberies.

   2.  *Assaults*

Keys was working behind the counter when he heard gunshots being fired. He saw a short, slim, African-American man come into the store and point a gun at a customer. The man then fired shots in the direction of the counter, at which point Keys ran to the back of the store. Keys could still hear shots being fired in his direction as he ran. Keys thought the shooter was wearing a black shirt with some kind of logo on it and a ski mask.

Lopez, who was also behind the counter, first heard loud popping sounds, similar to firecrackers, near the front door of the store. He saw a man dressed

in black and wearing a dark ski mask enter the store. The man was carrying a short rifle, and he fired shots in the direction of the counter. Lopez felt shots pass over his head. As he and Keys ran to the back of the store, the man yelled, "Where do you think you're going?" Lopez heard more shots being fired as he ran toward the back of the store.

### 3. *Attempted Murder*

Paul Stock, a customer, had been at the store for about 45 minutes and was near the front door when he saw a small African-American man wearing a ski mask quickly enter the store. The man was carrying a weapon that looked like a "pistol with a rifle butt end." The man put the gun in Stock's face, told him to open the register, and called him a "mother F'er." Stock told the man he did not work at the store and called the man a "mother F'er." Initially, Stock thought the man might be joking because the gun did not look real. The man replied, "[t]his is a real gun, mother F'er." Stock retorted, "I still don't work here," and called the man an "M F'er" again. At that point, the man attempted to shoot Stock, but the gun would not fire. The man cocked the gun, shot a round and a bullet went past Stock's head. After shooting at Stock, the man went over to the counter. Stock then ran out of the store.

Once outside, Stock got into his car and started to drive away. As he was driving away, the man with the gun came out of the store and started shooting at Stock's car. A bullet passed through Stock's car, first hitting the rear windshield and then becoming lodged in the front windshield. Additional shots were fired at the driver's side of Stock's car. Stock fled the area and reported the incident to a highway patrol officer. Stock later returned to the store and spoke to the police officers who had arrived at the scene.

Police retrieved three expended shell casings in the parking lot. Numerous shell casings and one intact bullet were found inside the store.

## C. *June 4, 2003 Homicides*

### 1. *Otilia Carrington*

Shortly after 4:00 a.m. on the morning of June 4, 2003, Gary Vitalie was working as a street sweeper operator for the City of Fairfield when he saw a woman, later identified as Otilia Carrington, in the street. Carrington had a cart with her, which appeared to contain all of her belongings. Carrington stood in the middle of the street. After a brief exchange, Vitalie continued on with his work. When he went down the street again, Carrington stopped Vitalie and asked him for his name, stating that she was going to report him to the city. After a few seconds of conversation, Vitalie returned to his work.

When he returned again to the same area to sweep a spot that he had missed, he saw Carrington at the entrance of an alleyway. She was leaning over and talking to someone through the passenger side of a silver Pontiac with shiny rims. The Pontiac had tinted windows, so Vitalie could not see who was in the car; he also could not tell if the engine was running. Vitalie later identified defendant's car as the one he saw that morning. Vitalie also identified a photograph of Carrington.

Shortly after 4:30 a.m. on June 4, 2003, Officer Ian Maddison responded to a report that a body had been found in an alleyway in downtown Fairfield. Upon arriving at the scene, he found a woman lying facedown. Also present at the scene was Officer Robert Moore, who found an intact .22-caliber round and two expended .22-caliber shell casings on the ground in the alleyway. Later that day Moore attended the autopsy of the victim, who had been identified as Carrington, where he collected a single bullet from her body. The cause of death was a gunshot wound to the chest.

### 2. *Rickshella Harrison*

Sometime after 4:00 a.m. on June 4, 2003, Lorraine Elton heard a man and woman speaking outside her residence located on Utah Street in downtown Fairfield. Elton heard the woman say in a frightened voice, " 'Oh, please, don't do that.' " About five minutes later, Elton heard a popping sound. She went back to bed and got up about an hour later when her newspaper was delivered. When she went to retrieve her newspaper, Elton found blood on her doorstep and a body on her front lawn. The responding police officer collected eight .22-caliber shell casings at the scene.

The victim was later identified as Rickshella Harrison. An autopsy of Harrison's body established the cause of death as a gunshot wound to the chest.

### D. *The Investigation*

#### 1. *Firearm Evidence*

Detective Steven Trojanowski participated in the investigation of both homicides. On June 25, 2003, he responded to a report that a firearm had been found near a restaurant in the same strip mall where Secrets Adult Superstore was located.

The weapon was later identified as being a "survival gun," because of the manner in which it could be taken apart and adapted. It was a .22-caliber long rifle, meaning it required .22-caliber long bullets, as opposed to .22-caliber

short bullets. If the wrong length of .22-caliber bullet were used, the gun would still fire one shot, but the gun would then jam and have to be reset before the next shot could be fired.

Sales records from the Shooting Gallery in Vacaville showed that this firearm had been sold to defendant on May 15, 2003. At the time of purchase, defendant presented a military identification card and a Louisiana state driver's license, and gave his address at Travis Air Force Base. After the 10-day waiting period, defendant picked up the gun on May 25, 2003.

Terry Fickies, a ballistics expert, described defendant's firearm as a .22-caliber semiautomatic rifle. Fickies examined the firearm, as well as other crime scene evidence. He opined that all of the bullets and shell casings found by the police at the crime scenes could have come from defendant's gun, and that certain bullets and casings definitely came from defendant's gun.

### 2. *Evidence from Defendant's Car*

The contents of defendant's car had been inventoried after the car had been repossessed. The inventoried contents, which had been placed in a box by the repossession company, included a wallet containing defendant's identification, as well as a bandana, which was folded in half and had two ends tied together. At some point, a Fairfield police officer reviewed the contents of the box.

### 3. *Evidence from Defendant's Room*

A search of defendant's room at Travis Air Force Base revealed a long-sleeved black T-shirt, with an emblem on the front. A subsequent search revealed "rap lyrics," which were composed by defendant that focused heavily on guns and violence.

### 4. *Evidence from Defendant's Computer*

A search of two computers on which defendant had user accounts indicated that on six occasions he had visited local media Web sites containing information about the crimes that had occurred in Fairfield on May 29 and June 4, 2003. Of the hundreds of Web sites visited through defendant's accounts, those were the only searches of local media crime reports.

### E. *Defense Case*

Defendant testified on his own behalf. He explained that he was from Shreveport, Louisiana, and had joined the Air Force when he was 17 years

old; he had been stationed at Travis Air Force Base. He admitted that he purchased the gun on May 15, 2003, from a store in Vacaville and picked it up 10 days later. Defendant explained that he was a "country boy" and had purchased the gun for recreational purposes. However, three days after he picked up the gun, it was stolen from his car, which had been parked in a mall in Fairfield. Defendant did not report the theft to mall security or the police. He explained that he was afraid he would get in trouble with the Air Force because he had kept the gun at the base, and he had not checked it into the armory as required by base regulations.

Defendant denied ever having been in Secrets Adult Superstore and also denied any knowledge of the killings of Harrison and Carrington.

On cross-examination, defendant acknowledged that he had encountered disciplinary problems in the Air Force, and that, at the time of the subject offenses, his enlistment had not been "working out."

Defendant denied having financial problems and explained that the outstanding car payments were due to a dispute with his insurance company, rather than his inability to pay. He admitted that he put new tires and rims on his car, but denied that he was being pressured to pay the balance of $1,700. He also acknowledged that his cell phone had been turned off for nonpayment, but explained that he did not pay the bill because he had lost the phone.

Defendant admitted that he made a $400 cash payment on his car that was posted to his account at the Travis Credit Union on June 4, 2003, at 9:15 a.m. He explained that he had deposited the cash payment the night before, when the bank was closed. He further explained that the deposit came from a $200 ATM cash withdrawal, as well as from other money he had. Defendant denied that he withdrew the $200 at the insistence of his supervisor, Sergeant Beatty, to make a payment on the debt for his car tires and rims.

Defendant agreed that the shirt looked like one of his. He also admitted that the bandana found in his car belonged to him. However, he did not tie it in the manner in which it was found and he did not know why it was tied in a triangular fashion. He said that he used the bandana to clean the rims of his wheels. When confronted about the absence of dirt and grime on the bandana, he clarified that he used it to shine the rims and not to remove dirt from them.

Defendant denied that his car was seen in downtown Fairfield on the morning of June 4, 2003. He said Vitalie was mistaken about seeing his car in the alleyway that morning.

A resident of Utah Street, who lived near where Harrison was killed, testified that he was awakened by gunshots about 4:00 a.m. on June 4, 2003.

He went to his window and saw a dark car, possibly a Honda Prelude, leaving the area. The car did not have shiny rims and was not the car depicted in the photographs shown to him.

## F. *Rebuttal*

On February 1, 2003, defendant made an auto parts purchase of approximately $1,700. He initially paid $1,500; he was expected to pay $50 the next month and $25 per month thereafter on the outstanding balance. The auto parts store made numerous unsuccessful collection attempts, including calls to two sergeants at defendant's air base.

On February 5, 2003, defendant took out a car loan from Travis Credit Union for $12,500.23. His original payments were $305.82 per month, but were increased to $383.92 in May 2003 due to the addition of insurance. Defendant missed his March payment; he made a cash payment of $305.82 in April. Collection efforts began in April, with numerous calls and letters. By June 2003, defendant had been notified that repossession efforts had been commenced. Defendant nevertheless made a payment of $400 that had been credited to his account approximately 9:00 a.m. on June 4, 2003. The payment consisted of one $50 bill, six $20 bills, two $10 bills, twenty-nine $5 bills, and sixty-five $1 bills. The money had been put into an envelope and left in the drop box. The drop box last had been emptied at 4:05 p.m. the previous day.

## II. DISCUSSION

### A. *Motion to Suppress*

Defendant contends the trial court erroneously denied his motion to suppress evidence that was the product of two warrantless searches of his barracks at Travis Air Force Base. He insists this evidence must be suppressed because it was obtained by an authorization to search and seize issued by the base commander of Travis Air Force Base, rather than by a civilian warrant issued by a magistrate.

#### 1. *Background*

On August 27, 2003, Fairfield Detective Cary Blasingame requested a search warrant to search defendant's vehicle and his person with respect to

various different items, including a dark-colored bandana and a black long-sleeved shirt with a round emblem on the chest. In support of his application, Detective Blasingame submitted a detailed affidavit setting forth the requisite probable cause to search.[2]

On the afternoon of August 27, 2003, a search warrant was issued by a Solano County Superior Court judge. That same day, Special Agent Kenneth James of the Air Force Office of Special Investigations requested an authorization to search defendant's person, his dorm room, his on-base work area, and any vehicles under defendant's control. In support of his application, Agent James submitted a detailed affidavit setting forth the reasons for the search and the items to be seized. Agent James also presented an affidavit from Detective Blasingame. Thereafter, Colonel Leonard Patrick, a commanding officer at Travis Air Force Base, issued an authorization to search and seize with respect to the following property: "Clothing to include but not limited to: A black shirt with a large circular logo, ski masks, a black bandana, any large sums of money, and any ammunition including but not limited to .22 caliber rifle ammunition, any firearm or firearm paraphernalia, a receipt for a firearm from the Shooting Gallery or any other gun store."

Pursuant to the authorization to search and seize, Detective Blasingame searched defendant's barracks at Travis Air Force Base on the evening of August 27, 2003. A number of items were seized as a result of this search, including notes referencing the "Shooting Gallery, Inc.," .22-caliber ammunition, and two black T-shirts with various stripes and insignias. A subsequent search of defendant's barracks occurred in March 2004, where the "rap lyrics" were found.[3]

Prior to trial, defendant raised numerous challenges to the evidence seized from his barracks,[4] including that the authorization to search and seize was not a legal substitute for a search warrant. Relying on *People v. Miller* (1987) 196 Cal.App.3d 307 [241 Cal.Rptr. 767] (*Miller*), which held, among other things, that an authorization to search is not the equivalent of a search

---

[2] The affidavit in support of the search warrant set forth the sequence of four violent crimes that had occurred within a short period of time and close geographic proximity, which had all been linked to a gun owned by defendant. Additionally, the affidavit in support of the search warrant further stated that defendant matched the physical description of the suspect in two robberies that had occurred just outside the military base where defendant resided. The affidavit further indicated that defendant owned a vehicle matching the description of a car observed by a witness at the scene of the third crime, involving the shooting death of a woman.

[3] In the motion to suppress, defendant challenged this followup search as being based on stale information. He does not raise this issue on appeal.

[4] Defendant argued below that the searches were not based on probable cause. He does not challenge the probable cause finding on appeal.

warrant (*id.* at pp. 313–315), defendant argued that a civilian warrant from a state court was required under the Fourth Amendment. Finding *Miller* to be factually distinguishable, the trial court ruled that the authorization to search was properly cognizable in the instant state court proceedings. In so ruling, the trial court noted that the authorization to search and seize, which was presented to the authorities at Travis Air Force Base, "contained also the affidavit in support of the search warrant, which had been signed by the Magistrate, so sort of a no harm, no foul even if one were to have found that it was not proper." The court further added the good faith exception (see *United States v. Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405]) was applicable to the search of defendant's quarters.

### 2. *Analysis*

Defendant's sole point of contention is the absence of a civilian search warrant at the time his quarters were searched. He does not question the existence of probable cause to procure a warrant or procedural compliance with military law. In other words, he would appear to have no quarrel with the admission of this evidence had he been tried and convicted by court-martial. Rather, he maintains that since he was tried and convicted by a jury in state court, a search warrant founded in civilian law was the only legally cognizable basis for the search of his quarters. We disagree.

■ The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Our state Constitution provides for similar safeguards against unreasonable searches and seizures. (Cal. Const., art. I, § 13.) As the United States Supreme Court has explained: "The touchstone of the Fourth Amendment is reasonableness. [Citation.] The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." (*Florida v. Jimeno* (1991) 500 U.S. 248, 250 [114 L.Ed.2d 297, 111 S.Ct. 1801]; see also *Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 126 S.Ct. 1943].)

■ Defendant misconstrues the applicability of the Fourth Amendment to military authorizations to search. The warrant clause does not apply to all searches. For example, a warrant is not required for searches incident to arrest (*Chimel v. California* (1969) 395 U.S. 752, 764 [23 L.Ed.2d 685, 89 S.Ct. 2034]), administrative inspections (*New York v. Burger* (1987) 482 U.S. 691, 712 [96 L.Ed.2d 601, 107 S.Ct. 2636]), and patdown searches (*Terry v. Ohio* (1968) 392 U.S. 1, 30–31 [20 L.Ed.2d 889, 88 S.Ct. 1868]). A

military authorization to search also does not require a warrant. (*U.S. v. Reppert* (D.Conn. 1999) 76 F.Supp.2d 185, 189; *United States v. Stuckey* (C.M.A. 1981) 10 M.J. 347, 361.) Nevertheless, the Fourth Amendment applies to military searches, and such searches must be reasonable. (*U.S. v. Reppert, supra*, 76 F.Supp.2d at p. 189.) That said, the military implementation of that guarantee is different than that employed in civilian cases due to the unique circumstances surrounding military bases. (*U.S. v. Chapman* (7th Cir. 1992) 954 F.2d 1352, 1367 (*Chapman*); *United States v. Brown* (10th Cir. 1986) 784 F.2d 1033, 1036.) The power to maintain order, security, and discipline on a military reservation is necessary to maintain military operations. (*Cafeteria Workers v. McElroy* (1961) 367 U.S. 886, 891–893 [6 L.Ed.2d 1230, 81 S.Ct. 1743].) "Furthermore, the base commander is responsible for all military property located on a military installation." (*United States v. Brown, supra*, 784 F.2d at p. 1036.)

Thus, in the military system of justice, procedures have been adapted to balance the rights of servicemembers against the needs of the military. (*Chapman, supra*, 954 F.2d at p. 1367, quoting *Solorio v. United States* (1987) 483 U.S. 435, 447 [97 L.Ed.2d 364, 107 S.Ct. 2924].) As such, an alternate procedure to a warrant issued by a magistrate has been developed, which is more compatible with the realities of military life. (*Chapman, supra*, at p. 1367; *United States v. Brown, supra*, 784 F.2d at p. 1036.)

■ Under rule 315(f)(1) of the Military Rules of Evidence,[5] an investigatory search of a member's quarters requires probable cause. (See *Chapman, supra*, 954 F.2d at p. 1358.) The rule provides a definition of probable cause that is substantially identical to the one used in nonmilitary situations. (Compare rule 315(f)(2) with *People v. Garcia* (2003) 111 Cal.App.4th 715, 721 [3 Cal.Rptr.3d 895].) Searches conducted under this rule require (except in limited circumstances) an authorization to search. (Rule 315(a), (b)(1)–(2), (g).) Authorization to search is defined as "an express permission, written or oral, issued by competent military authority to search a person or an area for specified property or evidence or for a specific person and to seize such property, evidence, or person." (Rule 315(b)(1).) An impartial military base commander is competent to issue authorizations to search (and seize) for persons and property situated in places under the commander's control. (Rule 315(d)(1); see also *United States v. Brown, supra*, 784 F.2d at p. 1036.)

Although scant California authority exists discussing the constitutional legitimacy of military searches, cases from other jurisdictions indicate that it is hardly a novel proposition. (See *Chapman, supra*, 954 F.2d at pp. 1367–1371; *United States v. Brown, supra*, 784 F.2d at pp. 1036–1037; *United States v. Banks* (9th Cir. 1976) 539 F.2d 14, 16–17; *Wallis v. O'Kier*

---

[5] All further references to rules are to the Military Rules of Evidence, United States, part III of the United States Department of Defense Manual Courts-Martial.

(10th Cir. 1974) 491 F.2d 1323, 1324–1325; *United States v. Grisby* (4th Cir. 1964) 335 F.2d 652, 656; *U.S. v. Reppert, supra,* 76 F.Supp.2d at p. 189; *United States v. Rogers* (E.D.Va. 1975) 388 F.Supp. 298, 302; *People v. Coit* (Colo.Ct.App. 1997) 961 P.2d 524, 527–528; *State v. Long* (1978) 37 N.C.App. 662, 667 [246 S.E.2d 846, 850].) Indeed, we are unaware of any cases holding military authorizations to search as unconstitutional. Since there is no evidence that the search was not supported by probable cause or that Colonel Patrick was so involved in the investigation of the crimes that his neutrality was compromised, the search complied with the Fourth Amendment.

Nevertheless, defendant appears to suggest that even if the search complied with military law, state law enforcement officers were required to seek a search warrant. An analogous argument was raised and rejected in *United States v. Grisby, supra,* 335 F.2d 652. There, evidence was seized in the defendant's living quarters pursuant to a verbal order of the Marine Corps chief of staff and the defendant was indicted in federal court. (*Id.* at pp. 653–654.) The defendant moved to suppress, apparently conceding that the search complied with military law, but arguing that the evidence should have been held inadmissible in a civilian criminal prosecution because it was warrantless. (*Id.* at p. 655.) The court denied the motion to suppress, explaining: "Grisby seems to contend, however, that even though the search was valid as a matter of military law, it cannot be recognized by a District Court as being valid. He seems to say that had he been tried and convicted by a Court Martial he would have had no basis for a contest over the admission in evidence against him of the property seized in his quarters, but that a District Court can recognize as valid only a search, the legality of which is founded in civilian law. We find no basis for such a distinction. Grisby was subject to military law at the time of the search. If the search was valid as a matter of military law when made, it was valid for all purposes, and admission of the fruits of the search ought not to be dependent upon the jurisdiction in which the subsequent trial is had." (*United States v. Grisby, supra,* 335 F.2d at pp. 655–656.)

Similarly, in *Chapman, supra,* 954 F.2d 1352, the Seventh Circuit upheld the admissibility of evidence procured by a military search and admitted as evidence in a civilian prosecution of an airman (*id.* at pp. 1355, 1366–1367). There, state and federal law enforcement officials participated in the search of the airman's quarters. (*Id.* at p. 1366.) On appeal, the defendant argued that such participation converted the search from a military search into a governmental one requiring a warrant. (*Ibid.*) Rejecting this contention, the court explained: "Because a procedure contemplated by the federal constitution was legitimately implemented by those permitted to use it, the *civilian federal officers were under no obligation to engage in the duplicative effort of securing a warrant from a magistrate.*" (*Id.* at p. 1371, italics added.)

So too here, as the authorization to search was properly obtained and implemented, the civilian officers were under no obligation to engage in the duplicative effort of securing a warrant from a magistrate. Defendant's position that the Fairfield police were required to obtain a warrant from the state court before they could legally search his on-base living quarters puts form over substance.

■ The Fourth Amendment prohibits unreasonable searches. We can find no basis for holding that a search, which was completely lawful and valid when made as a matter of military law, is unreasonable under the Constitution. "Since the search of living quarters on a military installation occupied by one subject to military law was constitutionally valid as a matter of military law, the [trial court] properly recognized it as being not constitutionally unreasonable or invalid and properly refused to suppress as evidence the fruits of the search." (*United States v. Grisby, supra*, 335 F.2d at p. 656.)

*Miller, supra*, 196 Cal.App.3d 307, relied upon by defendant, does not compel a contrary conclusion. There, the defendants, a sailor and a "dependent wife," did not live on a military base. (*Id.* at pp. 311–312.) Rather, they resided in a Navy housing area in the City of Long Beach. (*Id.* at p. 312.) Information concerning one of the defendant's drug-trafficking activities had been provided to the acting commander of the Long Beach Naval Station, who then authorized a search of the off-base naval housing under rule 315, which resulted in the seizure of drugs and various drug paraphernalia. (*Miller, supra*, at pp. 310–312.) On appeal, the defendants argued this evidence should have been suppressed on numerous grounds, including that the authorization to search was overbroad and not supported by probable cause or by an oath or affirmation. (*Id.* at pp. 312–313.) The defendants further contended that an authorization to search under the Military Rules of Evidence could not be properly issued for off-base naval housing. (*Miller, supra*, at p. 312.) Finally, the defendants claimed the search was invalid because civilian police officers had participated in executing the search. (*Id.* at p. 313.)

In reversing, the *Miller* court held the authorization to search did not support the search because the off-base naval housing area did not fall within the scope of a military search authorization. (*Miller, supra*, 196 Cal.App.3d at pp. 314–315.) The court also placed particular emphasis on the fact that state police had participated in the search, stating: "More importantly, the search in this case was fully participated in by civilian law enforcement; and the appellants were charged as civilians by civilian authority with violation of civilian law." (*Ibid.*) The court went on to state: "Under such circumstances, any prerogative the military authority may have had to prosecute its own laws cannot justify an invasion of the appellants' constitutional rights in state

court." (*Id.* at p. 315.) The court then drew a distinction between cases in which military courts are meting out military justice to military personnel and instances where military courts are seeking " ' "to make civilian authority the handmaiden of military discipline." ' " (*Ibid.*)

The court further concluded that even if the command authorization were the equivalent of a search, the one used in that case "clearly would not meet constitutional standards," as it lacked specificity and it was not supported by an oath or affirmation. (*Miller, supra,* 196 Cal.App.3d at pp. 315–317.) The court also questioned whether the authorization to search was supported by probable cause. (*Id.* at p. 316.) In conclusion, the court explained as follows: "Since state law enforcement officers were clearly integral to the instigation and execution of the search in this case, the constitutional deficiencies in the command authorization as a search warrant preclude us from upholding the validity of their efforts. We cannot condone such a violation of rights under some version of the now largely discarded 'silver platter' doctrine. [Citations.]" (*Ibid.,* fn. omitted.) Finally, the court noted that the good faith exception under *United States v. Leon, supra,* 468 U.S. 897, was inapplicable in that case due to the obvious facial invalidities of the command authorization as a search warrant equivalent. (*Miller, supra,* at p. 316, fn. 7.)

██ The instant case is distinguishable from *Miller* in several important respects. Here, unlike in *Miller,* there is no evidence that the search was not supported by probable cause, or that the authorization to search was facially invalid. Additionally, there is no indication that the application for permission to search directed to the base commander was intended to circumvent the warrant requirement or otherwise transform civilian authority into " ' "the handmaiden of military discipline." ' "[6] (*Miller, supra,* 196 Cal.App.3d at p. 315.) Moreover, unlike the defendants in *Miller,* one of whom was not military personnel, but was a "dependent wife" (*id.* at p. 311),

---

[6] While we appreciate the *Miller* court's cause for concern regarding the misuse of civilian law enforcement for strictly military purposes, the weight of authority addressing the validity of joint federal, state, and military enterprise suggests that the reasoning in *Miller* is flawed, at least with respect to its conclusion that participation of civilian law enforcement alone somehow invalidated the search conducted therein. (See *People v. Shepard* (1963) 212 Cal.App.2d 697, 699–701 [28 Cal.Rptr. 297] [presence of civilian officers; prosecution in state court]; *State v. Long, supra,* 37 N.C.App. at pp. 663–665 [246 S.E.2d at pp. 848–849] [evidence obtained by authorization to search used in state court]; see also *Chapman, supra,* 954 F.2d at p. 1371 [civilian officers participated in on-base search; prosecution in district court]; *United States v. Brown, supra,* 784 F.2d at pp. 1036–1037 [evidence obtained by military police used in district court prosecution]; *United States v. Banks, supra,* 539 F.2d at pp. 15–16 [military police acting on probable cause could properly detain, search and arrest civilians for on-base violations of civil law; evidence admitted in district court prosecution]; *United States v. Grisby, supra,* 335 F.2d at pp. 655–656 [evidence obtained by authorization to search admissible in district court prosecution]; *U.S. v. Reppert, supra,* 76 F.Supp.2d at pp. 188–189 [same]; *United States v. Rogers, supra,* 388 F.Supp. at pp. 299–301 [same].)

defendant herein was an active-duty airman living at Travis Air Force Base. Clearly, defendant was subject to military law, including the procedures with respect to an authorization to search his on-base living quarters. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Even if the search of defendant's quarters violated his Fourth Amendment rights, the evidence would be admissible under the good faith exception to the exclusionary rule articulated in *United States v. Leon, supra,* 468 U.S. 897. (See *Chapman, supra,* 954 F.2d at p. 1373 [good faith exception applied under Military Rules of Evidence]; *U.S. v. Lopez* (C.M.A. 1992) 35 M.J. 35, 40–41 [same]; see also rule 311(b)(3)(C) ["Evidence that was obtained as a result of an unlawful search or seizure may be used if: [¶] . . . [¶] (C) The officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant."].) As indicated, the affidavits prepared by Special Agent James and Detective Blasingame were not lacking in indicia of probable cause; each affidavit set forth with particularity the place to be searched and the items to be seized. Additionally, there is no suggestion that any statements in the affidavits were false or misleading, or that Colonel Patrick, the acting commanding officer, abandoned his duty of impartiality. (*United States v. Leon, supra,* 468 U.S. at p. 923.) Fairfield police officers were therefore justified in relying on the authorization to search. For these reasons, even if the search of defendant's quarters violated the Fourth Amendment, the investigating officers' reasonable good faith reliance on that authorization justified the trial court's denial of defendant's motion to suppress.

Finally, in light of the overwhelming evidence presented at trial, including eyewitness identifications; video surveillance tapes; the peculiarly tied dark bandana found in defendant's car; and ballistic evidence, together with uncontroverted evidence establishing defendant's ownership of the gun and the vehicle, we are confident beyond a reasonable doubt that any error in admitting the challenged evidence did not contribute to the verdict obtained, and was therefore harmless. (*People v. Kraft* (2000) 23 Cal.4th 978, 1036 [99 Cal.Rptr.2d 1, 5 P.3d 68]; see *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

## B. *Prosecutorial Misconduct*

Defendant claims that the prosecutor committed prejudicial misconduct in closing argument by equating the reasonable doubt standard to a mere "reasonable decision." Defendant acknowledges his trial counsel failed to object below but asserts this waiver is excused and/or is the product of ineffective assistance of counsel.

### 1. *Background*

During closing argument, the prosecutor, before summarizing the charges against defendant, stated the following regarding the trial court's reasonable doubt instructions: "His Honor is going to instruct you upon the burden of proof in this case, which applies in every criminal case, which is quite rightfully upon me, the People's representative, to prove . . . the defendant . . . guilty of these crimes beyond a reasonable doubt. [¶] There's an expectation placed upon you, upon your oath. I have discussed this with you when . . . selecting you as jurors, that you will, in fact, hold me to that standard and nothing less. That is what you are called upon to do. That's what you should do. Having done that, Ladies and Gentlemen, you will find . . . the defendant . . . guilty. [¶] What does that mean, beyond a reasonable doubt? The instruction, Ladies and Gentlemen, is not going to be of much help. What I ·would suggest to you is this. There's 14 of you gathered up here, all of you very different in your background, very diverse in your life experience which has brought you to this time and place. . . . [¶] One thing I can say, without knowing any more about you than we've gotten through the selection process as jurors, is that I can say, without question, that there isn't . . . one of you sitting up here who, at sometime in your lives, have been called upon to make extremely important decisions. I mean, I'm not talking about everyday kind of decisions. I'm talking about the critical, almost life changing . . . type [of] decisions which we are sometimes called upon to make in life whether we want to or not. Oftentimes, in life, when a big decision needs to be made, we don't want to make it. We wish—we want someone else· to make it for us. Oftentimes, it comes down as unavoidable. We have to make it. [¶] What do we do in those situations? We are presumed to be reasonable people. As reasonable people, we gather the facts before us that bear upon that decision making as fully as we can, knowing that there's always, in real life—and the courtroom is no different than any other aspect of real life. . . . There's always more we would like to know, we want to know. [¶] That being said, the need, the obligation to make a decision does not go away. So we gather the facts as best we can know them, and we apply our reason to them. And if having done that there is but one reasonable choice to make, we, as reasonable people, make that choice. As reasonable people, we do not choose to disregard the facts. We do not choose, as reasonable people, to do the unreasonable thing."

### 2. *Analysis*

"[A]s a general matter a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct." (*People v. Ledesma* (2006) 39 Cal.4th 641,

740 [47 Cal.Rptr.3d 326, 140 P.3d 657]; see *People v. Medina* (1995) 11 Cal.4th 694, 761 [47 Cal.Rptr.2d 165, 906 P.2d 2].) "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673]; see *People v. Harrison* (2005) 35 Cal.4th 208, 243–244 [25 Cal.Rptr.3d 224, 106 P.3d 895].)

We agree with the Attorney General that defendant waived this issue by failing to object to the reasonable doubt argument or to request a curative admonition. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1156 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Nguyen* (1995) 40 Cal.App.4th 28, 35–37 [46 Cal.Rptr.2d 840].) Moreover, this is not a case where an objection would have been futile. Defendant's trial counsel could have easily objected and requested the court to reinforce the jury's understanding of the reasonable doubt standard and the prosecutor's burden of proof. However, even if the issue had been preserved we would not reverse.

The statements by the prosecutor did not reduce reasonable doubt to a mere reasonable decision. (See, e.g., *People v. Nguyen, supra,* 40 Cal.App.4th at pp. 35–36 [prosecutor improperly suggested reasonable doubt standard applied to daily life decisions such as changing lanes or getting married]; see also *People v. Johnson* (2004) 119 Cal.App.4th 976, 985 [14 Cal.Rptr.3d 780] [trial court improperly altered statutory reasonable doubt definition by equating proof beyond a reasonable doubt to everyday decisionmaking]; *People v. Johnson* (2004) 115 Cal.App.4th 1169, 1171 [9 Cal.Rptr.3d 781] [same].) Rather, the prosecutor stressed the fact that the jury's task was akin to making a critical, life-changing decision, which required a careful and reasonable review of all available facts.

Our conclusion that the prosecutor's comments did not diminish the reasonable doubt standard "is reinforced by the fact that the trial court . . . admonished the jurors . . . after closing arguments, that they were required to follow the law and base their decision solely on the law and instructions as given to them *by the court.* Those admonishments were sufficient to dispel any potential confusion raised by the prosecutor's argument. No basis for reversal appears." (*People v. Barnett, supra,* 17 Cal.4th at p. 1157.)

Because we find that the prosecutor's comments were not objectionable, defense counsel's failure to object to them does not reflect a deficiency in her performance. Defendant was not, therefore, deprived of his right to effective assistance of counsel.

## III. DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Rivera, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 23, 2008, S167454. Werdegar, J., did not participate therein.